Fourth Division
December 28, 2006

No. 1-04-1477

| | | |
|---|---|---|
| WANDA MACK and REX T. FURLOUGH, SR., as Independent Administrators of the Estate of Eloise Warren, Deceased, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| KENNETH ANDERSON III, Individually and as an Agent and/or Employee of Anderson Surgical Group, S.C.; JUDITH KEDDINGTON, Individually and as an Agent and/or Employee of Anderson Surgical Group, S.C.; ANDERSON SURGICAL GROUP, S.C., | ) ) ) ) ) ) | No. 00 L 2059 |
| | ) ) | Honorable Donald M. Devlin, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE NEVILLE delivered the opinion of the court:

Wanda Mack and Rex Furlough, Sr., the independent administrators of Eloise Warren's estate (the plaintiffs), filed a medical malpractice action in the circuit court for wrongful death and named as defendants Dr. Kenneth Anderson, Dr. Judith Keddington, and Anderson Surgical Group, S.C., individually and as agents of SSM Health Care Corporation, doing business as St. Francis Hospital and Health Center (St. Francis Hospital), (the defendants). After a jury trial, a judgment was entered for the defendants. On appeal, the plaintiffs present the following three issues for our review: (1) whether the trial court erred and violated <u>Batson v. Kentucky</u>, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), when the plaintiffs and the defendants were given five peremptory challenges but the defendants used their five peremptory challenges to remove five black jurors from the jury; (2) whether the trial court erred when it instructed the jury with Illinois Pattern Jury

Instructions, Civil, No. 12.05 (2005 ed.) (hereinafter IPI Civil (2005); and (3) whether the trial court erred when it denied the plaintiffs' motion for judgment notwithstanding the verdict.

BACKGROUND

This opinion only involves a discussion of those facts that the court needs to address the issues presented in this appeal. On April 26, 1999, Ms. Warren was admitted to St. Francis Hospital for the purpose of having a laparoscopic Nissen fundoplication performed to help alleviate her acid reflux condition. Dr. Anderson and Dr. Keddington performed the laparoscopic Nissen fundoplication procedure. After the operation, Ms. Warren began to experience swelling in her neck and tightness in her chest. Between April 27 and May 7, 1999, Ms. Warren underwent a series of tests and Xrays to diagnose the problems she was experiencing. On May 7, 1999, Dr. Anderson and Dr. Keddington performed a laparotomy on Ms. Warren to repair a perforation of the anterior wall of her stomach, which occurred during the initial laparoscopic Nissen fundoplication on April 26, 1999. On May 9, 1999, Ms. Warren underwent another chest Xray which revealed extensive subcutaneous emphysema. Shortly thereafter, another operation was performed to relieve a right tension pneumothorax that had developed in her chest. On May 10, 1999, two weeks after she underwent the laparoscopic Nissen fundoplication surgery, Ms. Warren suffered a cardiac arrest and died. Mack and Furlough, the independent administrators of Ms. Warren's estate, filed a complaint for wrongful death and named Dr. Anderson, Dr. Keddington, and St. Francis Hospital as defendants.

Jury Selection

On August 19, 2003, jury selection began. The plaintiffs and defendants were each given five peremptory challenges. Jury selection culminated in the following 12 jurors being selected: Panel 1: Patricia Cahill, Deanne MacDonald, John Labranche, and Sharonda Holmes; while selecting the second panel of jurors, prospective juror Raymond Riley was challenged and excused by Dr. Anderson's attorney; Panel 2: Claudia Hurtado, Irene Correa, Michael Sietsema, and Lois Hervai; and Panel 3: Mary Ellen Quarles, Mary Strotman, Robert Blafka, and Raymond Davies.

After the three panels of jurors were selected by the parties, the court began selecting the alternates and the following colloquy took place:

"THE COURT: *** Panel now to the plaintiffs is Collins, and Larry Stewart, the ramp worker at O'Hare.

MR. ROGERS: Plaintiff tenders.

THE COURT: All right. Anderson, you are tendered Norma Collins and Larry Stewart.

MR. LURA: Anderson will use his last strike on Larry Stewart, your Honor.

THE COURT: Very well. The panel to you now is Collins and Bowman, and that goes to Keddington. Keddington?

***

MR. LANGHENRY: Your Honor, I'm going to excuse Ms. Collins.

THE COURT: Keddington excuses Collins. All right. The panel to you now is Bowman and Barry.

***

THE COURT: Again, I don't – there was no representation here. He consulted with Mr. Rogers and there was no attorney/client relationship established. No, I'm not going to excuse for cause.

MR. LANGHENRY: I move to excuse Mr. Barry.

THE COURT: Mr. Barry, who's doing this?

MR. LURA: Keddington.

MR. LANGHENRY: Keddington.

THE COURT: Mr. Barry is excused by Keddington. All right.

Hospital, the panel to you now is Latonya Bowman and Orlassia Sims.

MS. ENRIGHT: I'll strike Sims, your Honor.

THE COURT: Very well. Panel to you is Bowman and Seals.

MS. ENRIGHT: I'll accept that, your Honor."

THE PLAINTIFFS' BATSON MOTION

Step One of the Batson Hearing

After the alternates Latonya Bowman and Roger Seals were tendered to the plaintiffs, the plaintiffs' attorney made a motion, pursuant to Batson, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, arguing that the defendants had used their peremptory challenges to exclude five black jurors from the jury. The plaintiffs' counsel argued that "[e]very single juror that the defendants have stricken has been African American." The black jurors excused by the defendants were: (1) Raymond Riley, (2) Larry Stewart, (3) Norma Collins, (4) Ruben Barry, and (5) Orlassia Sims. The trial court noted that Dr. Anderson's counsel used his peremptory challenges to exclude Riley and Stewart; Dr. Keddington's counsel used her peremptory challenges to exclude Collins and Barry; and the hospital used its peremptory challenge to exclude Sims. The trial court then stated that "in terms of the procedure here, I believe the defendants are required to give me a race neutral reason for each of these challenges." The defendants argued that the plaintiffs failed to establish a pattern of discrimination because three of the jurors, John Labranche, Sharonda Holmes, and Mary Ellen Quarles, accepted by the defendants were African-Americans. The court stated that all of the defendants' peremptory challenges had been exercised against African-Americans and that the defendants had to provide a race-neutral reason for their exclusion.

Step Two of the Batson Hearing

Raymond Riley

One of the defendants' attorneys noted that during *voir dire*, he had expressed concern about Raymond Riley. The defendants' attorney stated that Riley never looked up or made eye contact with the attorneys when

being questioned and one defense attorney opined that he might be a "goofball" juror. Plaintiffs' attorney stated that he did not think Riley was a "goofball."

During additional questioning in chambers, Riley stated that he had a high school education; that he has worked in various jobs since graduating high school in 1977; and that he was not having any problems understanding the nature of the proceedings. At the conclusion of the questioning, the trial judge stated that he did not think Riley was a "goofball," and that he did not think that Riley is "the type that's going to be obstructionist back there in the jury room." Defense counsel, when providing a race-neutral reason, reiterated his concern that Riley would be a "border-line goof juror" due to his lack of eye contact and the fact that his personality type was not suited for sitting on a medical malpractice jury.

### Larry Stewart

When discussing venireman Larry Stewart, one of the defendants' attorneys stated that he was excluded because he nodded his head when plaintiffs' counsel posed a question to the venire about awarding damages. Defense counsel stated that when plaintiffs' counsel asked the panel about damages, Stewart was "nodding his head yes, yes, yes, yes before the question was even out of his mouth." Defense counsel stated that "granted these jurors have heard all of our questions before, but given the affirmance that he awards millions of dollars, I can't afford to have Mr. Stewart on this jury."

### Norma Collins

When Norma Collins was questioned during *voir dire*, the trial judge asked whether she had been a party to a lawsuit. She replied that she was involved in a worker's compensation case. The trial judge then stated "[o]ne thing everybody should understand is that the worker's compensation system is totally different than this. It has different rules, different regulations, different structure, totally different." The trial judge said to Collins "so can you just forget about that," and Collins responded "yes."

While providing the court with a race-neutral reason for excluding Collins, the defendants' attorney cited her worker's compensation injury claim. The defendants' attorney stated that in his view she talked about

the matter as if it was "a real positive thing." Defense counsel opined that Collins was a very litigious person. Defense counsel also stated that he observed all the jurors in Collins' group during the questions involving damages and that Collins silently nodded during that time.

### Ruben Barry

During *voir dire,* venireman Ruben Barry mentioned that he met with and consulted with the plaintiffs' attorney (Larry Rogers) sometime in 1994 regarding plaintiffs' counsel's possible representation in a wrongful death lawsuit. Barry stated that although he met with plaintiffs' attorney, he did not retain him on the case. Barry stated that he had not formed any opinions about plaintiffs' attorney or his firm that would impair his ability to be fair and impartial in this case. When defense counsel asked whether he met with plaintiffs' counsel based on recommendations, Barry stated he could not remember how he initially received plaintiffs' counsel's name to contact him.

Defense counsel stated that he was concerned because Barry does not know any of the defense attorneys and that perhaps the plaintiffs' counsel would get "a little bit of a leg up because of your past relationship with him." Barry responded that he understood the concern, but that "the opposite could be true also, that he's got a leg down because we didn't go to him." The trial judge stated that he did not see anything wrong with having Barry on the jury. When providing a race-neutral reason for excluding Barry, the defendants' attorney repeated that his acquaintance with the plaintiffs' attorney was the reason for excluding him.

### Orlassia Sims

When asked to provide a race-neutral reason for excluding venirewoman Orlassia Sims, the defendants' attorney stated that his only observation of Sims was that "I was watching her while we were waiting for selection, it appeared to me that she was disinterested in the proceedings that we were going through. I was concerned that she wouldn't be motivated to pay attention during the case."

### Step Three of the Batson Hearing

After the defendants' attorneys provided their reasons for excluding the five African-American venirepersons, plaintiffs' counsel argued that although the defendants' attorneys argued that they observed the potential jurors nodding their heads, none of the defense attorneys chose to question any of the venirepersons about what they observed. Plaintiffs' counsel also argued that the record does not reflect that the venirepersons were nodding in response to some questions. Plaintiffs' counsel argued that he did not observe any of the alleged head-nodding and that, if anything, the record reflects that there was no bias on behalf of the venirepersons. The trial court denied the plaintiffs' Batson motion stating, "well, we've also seen jurors. We have all noticed body language with people. Sometimes that body language is favorable to us and sometimes it's not." The trial court stated that the defendants' attorneys provided race-neutral reasons for challenging the African-American venirepersons who were excluded from the jury. Finally, after the trial court denied the plaintiffs' Batson motion, the plaintiffs challenged Bowman, and Seals and Blameuser were accepted as alternate jurors by the parties.

The Trial

The case proceeded to trial on August 21, 2003. The plaintiffs presented the following witnesses: Dr. Yong Khu Choe, Dr. Shaku Teas, nurse James Ulaszek, Dr. Anderson, Rex Furlough, Etta Furlough, Gloria Adams, Patricia Perry, Dr. Keddington, Dr. Stuart Gourlay, and Mary Furlough. The defense presented the following witnesses: Dr. Anderson, Dr. Keddington, Dr. Robert Fitzgibbons, Jr., and Dr. Shaku Teas. On September 2, 2003, the jury returned a general verdict in favor of Dr. Anderson, Dr. Keddington, and St. Francis Hospital, finding that the defendants were not negligent and/or that nothing the defendants did or failed to do proximately caused Ms. Warren's death. On September 3, 2003, the trial court entered a judgment on the verdict. The plaintiffs filed a motion seeking a judgment notwithstanding the verdict or a new trial. On April 20, 2004, the trial court denied the plaintiffs' posttrial motion.

ANALYSIS

I. Batson

The plaintiffs' first argument on appeal is that the defendants used their peremptory challenges to exclude five black jurors from the jury in violation of <u>Batson</u>, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. The plaintiffs argue that the race-neutral reasons provided by the defendants for excluding the five black jurors were nothing more than a pretext for racial discrimination. The plaintiffs specifically contest the race-neutral reasons provided by the defendants' attorneys for excluding three of the black jurors: Norma Collins, Larry Stewart, and Orlassia Sims. During the <u>Batson</u> hearing, Dr. Anderson's attorney excluded Stewart because he nodded his head when the topic of damages was asked of the panel, and the hospital's attorney excluded Sims because in addition to nodding her head about the topic of damages, she seemed disinterested during the proceedings. Dr. Keddington's attorney explained that he used a peremptory challenge to exclude Collins because she filed a worker's compensation claim, because she was viewed to be a litigious person, and because she silently nodded when the topic of damages was asked of the panel. The plaintiffs contend that the defendants' objective was to exclude the black jurors from the jury.

The defendants argue that the trial court correctly ruled that the defendants' reasons for exercising their peremptory challenges to exclude the black jurors were valid race-neutral reasons. The defendants also argue that excluding venirepersons based upon their conduct and body language is a race-neutral reason because one purpose of *voir dire* is to observe the demeanor of potential jurors. The defendants argue that the plaintiffs have failed to demonstrate that their race-neutral reasons for excluding the black jurors was not genuine. Furthermore, the defendants contend that the record refutes the plaintiffs claim of racial discrimination because although they had peremptory challenges they could have exercised, (1) the defendants permitted three African-Americans to remain on the jury, and (2) the defendants accepted an African-American as an alternate, but she was excluded by the plaintiffs' attorney.

In <u>Batson</u>, the United States Supreme Court held that, in a criminal case, the fourteenth amendment's equal protection clause prohibits a prosecutor from using a peremptory challenge to exclude a prospective juror solely on the basis of his or her race. <u>Batson</u>, 476 U.S. at 89, 90 L. Ed. 2d at 83, 106 S. Ct. at 1719. Under

Batson, the equal protection clause is violated when the facts show that the State excluded an African-American venireperson on the assumption that he or she will be biased in favor of defendant simply because of their shared race. Batson, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723. In Powers v. Ohio, 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991), the United States Supreme Court recognized that Batson "was designed 'to serve multiple ends,' " only one of which was to protect individual defendants from discrimination in the selection of jurors. Powers, 499 U.S. at 406, 113 L. Ed. 2d at 422, 111 S. Ct. at 1368, citing Allen v. Hardy, 478 U.S. 255, 259, 92 L. Ed. 2d 199, 205, 106 S. Ct. 2878, 2880 (1986) (per curiam) (quoting Brown v. Louisiana, 447 U.S. 323, 329, 65 L. Ed. 2d 159, 166, 100 S. Ct. 2214, 2220 (1980)). In addition to protecting the defendant, Batson sought to protect excluded jurors and the community at large from a prosecutor's discriminatory use of peremptory challenges. Powers, 499 U.S. at 406, 113 L. Ed. 2d at 422, 111 S. Ct. at 1368, citing Batson, 476 U.S. at 87, 90 L. Ed. 2d at 81, 106 S. Ct. at 1718. The extension of Batson in this context is designed to remedy the harm done to the "dignity of persons" and to the "integrity of the courts." Georgia v. McCollum, 505 U.S. 42, 48, 120 L. Ed. 2d 33, 44, 112 S. Ct. 2348, 2353 (1992), citing Powers, 499 U.S. at 402, 113 L. Ed. 2d at 419, 111 S. Ct. at 1366.

The rule announced in Batson -- that the State may not use peremptory challenges to purposefully exclude jurors based on their race -- applies with equal force to private litigants in civil cases. Edmonson v. Leesville Concrete Co., 500 U.S. 614, 630, 114 L. Ed. 2d 660, 680, 111 S. Ct. 2077, 2088 (1991); see also McDonnell v. McPartlin, 192 Ill. 2d 505, 526 (2000); Jones v. Rockford Memorial Hospital, 316 Ill. App. 3d 124, 127 (2000). The Batson Court provided a three-step process for evaluating claims of discrimination in jury selection. Rice v. Collins, 546 U.S. _, _, 163 L. Ed. 2d 824, 831, 126 S. Ct. 969, 973 (2006). First, the moving party must meet his burden of making a *prima facie* showing that the nonmoving party exercised its peremptory challenge on the basis of race. Rice, 546 U.S. at _, 163 L. Ed. 2d at 831, 126 S. Ct. at 973, citing Batson, 476 U.S. at 96-97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723; People v. Easley, 192 Ill. 2d 307, 323 (2000). If a *prima facie* case is made, the process moves to the second step where the burden then shifts to the nonmoving party to

articulate a race-neutral explanation for excusing the venireperson. Rice, 546 U.S. at _, 163 L. Ed. 2d at 831, 126 S. Ct. at 973, citing Batson, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. 1723; see also Easley, 192 Ill. 2d at 323-24. Once the nonmoving party articulates its reasons for excusing the venireperson in question, the process moves to the third step, where the trial court must determine whether the moving party has carried his burden of establishing purposeful discrimination. Rice, 546 U.S. at _, 163 L. Ed. 2d at 831, 126 S. Ct. at 973, citing Batson, 476 U.S. at 98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1724. At the third step, the trial court evaluates the reasons provided by the nonmoving party as well as claims by the moving party that the proffered reasons are pretextual. Rice, 546 U.S. at _, 163 L. Ed. 2d at 831, 126 S. Ct. at 973; People v. Davis, 345 Ill. App. 3d 901, 906 (2004), citing People v. Pecor, 286 Ill. App. 3d 71, 74 (1996).

## A. The *Prima Facie* Case

According to Batson, in order to establish a *prima facie* case of purposeful discrimination in the exercise of its peremptory challenges, the moving party, here the plaintiffs, must present facts and any other relevant circumstances which raise an inference that the prosecutor, the defendants' attorneys in this case, challenged venirepersons on account of their race. Batson, 476 U.S. at 96, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723. Some of the factors generally deemed relevant in establishing a *prima facie* case of discrimination include: (1) the racial identity between the moving party and the excluded venireperson; (2) a pattern of strikes against African-American venirepersons; (3) a disproportionate use of peremptory challenges against African-American venirepersons; (4) the level of African-American representation in the venire as compared to the jury; (5) the prosecutor's questions and statements during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogenous group sharing race as their only common characteristic; and (7) the race of the moving party, victim, and witnesses. People v. Williams, 173 Ill. 2d 48, 71 (1996). These examples of the generally recognized relevant factors or circumstances are "merely illustrative," and are not all inclusive. Batson, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723; People v. Holman, 132 Ill. 2d 128, 173 (1989).

In this case, although the trial court did not specifically state that the plaintiffs presented a *prima facie* case of racial discrimination, it stated that based upon the <u>Batson</u> procedural rules, the defendants had to provide a race-neutral reason for excusing the African-American venirepersons. We note that the venireman Raymond Riley, a black juror, was challenged and removed by Dr. Anderson's attorney while the parties were selecting the second panel of jurors. We also note that the defendants exercised four successive peremptory challenges to remove the following black prospective jurors from the jury: Larry Stewart, Norma Collins, Ruben Barry and Orlassia Sims. In addition, we note a racial identity between the plaintiffs, the moving parties, and the five black jurors that were excused; we note a pattern of strikes because four of the five black jurors were challenged in succession by the defendants; and we note a disproportionate number of peremptory challenges were exercised by the defendants against one group of jurors, the black jurors, because 100% of the defendants' peremptory challenges were exercised against black jurors. Consequently, we note that once the defendants exercised their five peremptory challenges and excluded the five black jurors and the plaintiffs' attorney made his <u>Batson</u> motion, the trial court conducted a <u>Batson</u> hearing.

## B. <u>Defendants' Proffered Race-Neutral Reasons</u>

Our review now turns to the second step in the <u>Batson</u> procedure to determine whether the defendants' reasons for excluding the African-American venirepersons were race-neutral. We note that the question of whether the plaintiffs have established a *prima facie* case of discrimination becomes a moot point once the trial court rules on the ultimate question and finds valid, race-neutral reasons supporting the peremptory challenges. <u>People v. Rivera</u>, 221 Ill. 2d 481 (2006); see also <u>People v. Hudson</u>, 157 Ill. 2d 401, 427-28 (1993), citing <u>People v. Mitchell</u>, 152 Ill. 2d 274, 289 (1992) ("[T]his court has recently held that once the trial court rules on the ultimate question of discrimination, the question of whether the defendant established a *prima facie* case became moot"). We also note that the explanation for excusing a venireperson need not rise to the level of a challenge for cause; however, a mere assertion of nondiscriminatory motive or of good faith will not rebut a *prima facie* case. <u>People v. Andrews</u>, 155 Ill. 2d 286, 293 (1993); see also <u>Davis</u>, 345 Ill. App. 3d at 911 (the

trial court should not give rubber-stamp approval to offered nonracial explanations). The explanation must be clear and reasonably specific, it must contain legitimate reasons for exercising the challenge, and it must be related to the particular case to be tried. Batson, 476 U.S. at 98 & n. 20, 90 L. Ed. 2d at 88-89 & n. 20, 106 S. Ct. at 1723-24 & n. 20; Davis, 345 Ill. App. 3d at 911, citing People v. Allen, 168 Ill. App. 3d 397, 404 (1987). The explanation must demonstrate that the excluded venireperson exhibited a "specific bias" related to the particular cause on trial, other than that his or her shared race with a party may bias him or her in favor of that party. Andrews, 155 Ill. 2d at 293. We also note that there will seldom be much evidence bearing upon the ultimate question of discrimination and the " 'best evidence often will be the demeanor of the attorney who exercises the challenge.' " People v. Rivera, 221 Ill. 2d 481, 852 N.E. 2d 771, 784 (2006), quoting Hernandez v. New York, 500 U.S. 352, 365, 114 L. Ed. 2d 395, 409, 111 S. Ct. 1859, 1869 (1991). The evaluation of the attorney's state of mind is most often based on demeanor and credibility, which lies within the trial judge's province. Hernandez, 500 U.S. at 365, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869, quoting Wainwright v. Witt, 469 U.S. 412, 428, 83 L. Ed. 2d 841, 854, 105 S. Ct. 844, 854 (1985). The trial court's finding of whether purposeful discrimination has been proved is a finding of fact and will not be overturned on review unless it is found to be clearly erroneous. Hernandez, 500 U.S. at 365, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869; Andrews, 155 Ill. 2d at 293-94.

In this case, while five black jurors were excluded by the defendants' attorneys, the plaintiffs argue that only three of the black jurors were excluded for reasons that were not valid or race-neutral. The plaintiffs specifically object to the defendants exercising their peremptory challenges against venirepersons Larry Stewart, Norma Collins, and Orlassia Sims. Therefore, we limit our consideration in this case to the three aforementioned black jurors that were excused by the defendants.

The defendants explained that they excluded Stewart because he nodded his head when the topic of damages was asked of the panel, and Sims was excluded because in addition to nodding her head about the topic of damages, she seemed disinterested during the proceedings. The defendants explained that they

exercised a peremptory challenge to exclude Collins because she filed a worker's compensation claim, because she was considered to be a litigious person, and because she silently nodded when the topic of damages was asked of the panel.

### C. The Trial Court's Batson Findings

The trial court accepted the defendants' reasons for excluding the black jurors and denied the plaintiffs' Batson motion stating, "Well, we've also seen jurors. We have all noticed body language with people. Sometimes that body language is favorable to us and sometimes it's not." The trial court found that "[i]n terms of Mr. Stewart, Ms. Collins, and Ms. Sims, the [defendants] concerns seem to be their attitudes toward damages, which I believe is a race neutral reason." The trial court stated that there was no Batson violation because the defendants' attorneys provided race-neutral reasons for excluding the five black jurors from the jury.

### II. Evaluation of the Trial Court's Findings

Now, we review the trial court's findings at the conclusion of the third step of its Batson hearing. The question that must be answered during the third step of Batson is whether the plaintiffs carried their burden of proving purposeful discrimination. Miller-El v. Cockrell, 537 U.S. 322, 338, 154 L. Ed. 2d 931, 951, 123 S. Ct. 1029, 1040 (2003). Here, the critical question in determining whether the plaintiffs have proved purposeful discrimination at the third step is the persuasiveness of the defendants' explanations for exercising their peremptory challenges against three of the five black jurors. Cockrell, 537 U.S. at 338-39, 154 L. Ed. 2d at 951, 123 S. Ct. at 1040. The plaintiffs maintain that the defendants were given five peremptory challenges and they were all exercised against black jurors. At this step, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Cockrell, 537 U.S. at 339, 154 L. Ed. 2d at 951, 123 S. Ct. at 1040, quoting Purkett v. Elem, 514 U.S. 765, 768, 131 L. Ed. 2d 834, 839, 115 S. Ct. 1769, 1771 (1995). The issue comes down to whether the trial court finds the race-neutral explanations to be

credible. Cockrell, 537 U.S. at 339, 154 L. Ed. 2d at 951, 123 S. Ct. at 1040. A legitimate race-neutral reason is not a reason that makes sense, but a reason that does not deny equal protection. Purkett, 514 U.S. at 769, 131 L. Ed. 2d at 840, 115 S. Ct. at 1771. We must determine, by examining the record, whether the trial court's factual determination --- that the plaintiffs offered valid race-neutral reasons for excluding the five Africa-American venirepersons --- was clearly erroneous. Hernandez, 500 U.S. at 364-66, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869; Andrews, 155 Ill. 2d at 293-94.

### A. Larry Stewart

When considering venireperson Larry Stewart, the defendants stated that they used a peremptory challenge to exclude him from the jury because when the plaintiffs questioned the panel about whether they could award a million dollars, Stewart was "nodding his head yes, yes, yes, yes before the question was even out of his mouth." The defendants' attorney challenged Stewart based upon his observations of Stewart. We note that while demeanor has been found to be a legitimate race-neutral reason for exercising a peremptory challenge (Rice, 546 U.S. _, 163 L. Ed. 2d 824, 126 S. Ct. 969 (the prosecutor's grounds for peremptory challenge of juror based on her demeanor, although not witnessed by the judge, were sufficient and will be given deference where reasonable)), such explanations must be closely scrutinized. Easley, 192 Ill. 2d at 327. The Illinois Supreme Court has recognized that a person's demeanor is a subjective assessment that should be given close scrutiny because such perceptions may easily be used as a pretext for discrimination. People v. Williams, 209 Ill. 2d 227, 245 (2004), citing People v. Wiley, 165 Ill. 2d 259, 274-75 (1995). In reviewing a proffered race-neutral explanation for excluding a venireperson, we "are not to close our eyes as judges to what we must perceive as men." People v. Randall, 283 Ill. App. 3d 1019, 1026 (1996), quoting People v. Knapp, 230 N.Y. 48, 63, 129 N.E. 202, 208 (1920). Courts must also determine whether the explanation demonstrates that the excluded venireperson exhibited a "specific bias" related to the particular case, other than that his or her shared race with a party may bias him or her in favor of that party. Andrews, 155 Ill. 2d at 293.

Here, defense counsel stated that Stewart nodded his head when the plaintiffs' attorney asked the venire

about awarding damages. We note that the record establishes that, during *voir dire,* all the jurors were observed nodding or shaking their heads.

First, while questioning the first 12 prospective jurors (Mark Baker, Patricia Cahill, Elizabeth Craig, Deanne McCannon, Sean McDonald, John LaBranche, Jodi Whitney, Chris Mariano, Robin Young, Sharonda Holmes, Pawel Kanaga, and Claudia Hurtado), including Cahill, McDonald, LaBranche, Holmes, and Hurtado, who served on the jury, these jurors were asked the following question by the plaintiffs' attorney:

"MR. ROGERS: *** Both sides start out evenly before you've heard

any of the evidence?

PROSPECTIVE VENIRE: (Nodding head up and down.)"

While questioning the second set of 12 prospective jurors (Irene Correa, Matthew Sinde, Jr., Raymond Riley, Michael Sietsema, Jennie Blameuser, Lois Hervai, Patricia Fairchild, Corrine Richmond, Mary Ella Quarles, Joseph Hynes, Mary Strotman, and James Walter), including Correa, Sietsema, Hervai, Quarles, and Strotman who served as jurors, these jurors were asked the following questions by Mr. Rogers, the plaintiffs' attorney:

"MR. ROGERS: *** And all of you can follow the law as Judge

Devlin gives it to you even if you disagree with the law?

(Nodding Heads.)

Anyone have any problem with that?

(Shaking heads.)

And, lastly, if the law and evidence supported it, could all of you sign a

verdict form for many millions of dollars if you feel it's fair and reasonable

compensation for the death in this case?

(Nodding heads.)"

Then, Mr. Lura, one of the defendants' attorneys, asked the following questions:

"MR. LURA:  Thank you.  Mr. Sinde, well, before I get to you, the exact opposite question that Mr. Rogers asked each of you, there's no question there's a tragedy here, but if the plaintiff does not prove their case or prove that the physicians caused the death, is anybody here going to be so overwhelmed by the tragedy that they won't be able to send the family home with no money at all?

(Shaking heads.)

Will you be able to sign verdicts on behalf of the doctors and the hospital?

(Nodding heads.)

Anybody have a problem with that?

(Shaking heads.)

No? Okay."

Finally, the third group of 12 prospective jurors (Robert Blafka, Raymond Davies, Carmen Santiago, Barbara Murray, Nora Collins, Ramon Ruiz, Larry Stewart, Latonya Bowman, Ruben Barry, Jr., Orlassia Sims, Carol Nicolosi, and Roger Seals), including Blafka and Davies, who served as jurors, were asked the following questions by the court:

"THE COURT:  *** Okay.  If the plaintiffs over here prove their case, plaintiffs prove their case, do any of you have any hesitation of signing a verdict in favor of the plaintiffs?  Any hesitation at all?

(Shaking heads.)

If they fail to prove their case, would anyone have any hesitation to signing a verdict for the defendants over there?

(Shaking heads.)

Okay. Now, again, let's talk about damages. You heard me say this morning that the jury basically has three broad decisions to make: Was there negligence, did that negligence cause harm, and if it did, what are the damages going to be, damages basically being fair and reasonable compensation. Anybody have any problems here in terms of if it comes to that, awarding monetary damages? Anybody have any problems with it?

(Shaking heads.)

Does anybody have any set amount in their mind above which they can never go? Anybody in terms of that?

(Shaking heads.)

All right. Now, again, let's assume that plaintiffs show that there was injury here but they failed to show that that injury was caused by this negligence on the part of defendants.

Would any of the 12 of you have any hesitation in signing a verdict in favor of the defendants even though it would mean the plaintiffs would leave this courtroom uncompensated? Anybody?

(Shaking heads.)"

Our review of the record simply reveals that the panel responded to the court's, plaintiffs' and defendants' counsel's questions by nodding or shaking their heads. We note that such nonverbal actions were not limited to the questions on damages, but that routinely during *voir dire* when venirepersons were questioned

as a group, there were nonverbal answers including "no verbal response"[1] and "laughter."[2]  We note that the record establishes that Stewart was not the only juror who nodded or shook his head.  We also note that all 36 jurors, who were black and white, nodded or shook their heads when answering group questions. Finally, and most importantly, we note that the defendants' attorneys did not excuse white jurors who nodded or shook their heads in response to questions asked of the entire venire.

Specifically, the record establishes that when plaintiffs' counsel questioned Patricia Cahill, Sean McDonald, Irene Correa, Michael Sietsema, Lois Hervai, and Mary Strotman, venirepersons selected to sit on the jury, about damages that these jurors responded by nodding their heads.  Indeed, during oral argument, the defendants' attorneys admitted that white venirepersons also nodded their head in response to the same question about damages. However, the defendants' attorneys did not challenge or exclude white venirepersons who nodded or shook their heads in response to questions about damages.  We find the defendants' explanation for excluding Stewart to be pretextual and a denial of equal protection because the defendants did not challenge or exclude white jurors who nodded their heads when asked the same questions about damages; instead, white jurors who nodded their heads were permitted to serve on the jury.

We also note that the trial court found that the defendants excluded Stewart, Sims and Collins not because of their race, black, but because of their "attitudes toward damages," which the court found to be race neutral.  Given the fact that all the jurors, black and white, nodded or shook their heads when asked a group question about damages, we have to assume that they all had the same attitude toward damages because the

---

[1] "[Defense Counsel:] Does anyone have any medical training of any type that they haven't mentioned before?

(No verbal response.)"

[2] "THE COURT:  All right.  Okay.  You folks in the jury box please gather up your belongs [sic] and those of you who haven't been called yet, you know what's coming.

(Laughter.)"

record establishes they all engaged in the same conduct. Comparing the defendants' rationale for excluding Stewart, who nodded his head, and applying the defendants' rationale to the white jurors, who also nodded their heads but were permitted to serve on the jury, establishes that race, rather than the jurors' attitudes toward damages, was the determining factor in which jurors the defendants challenged and which jurors the defendants permitted to serve on the jury. See Miller-El v. Dretke, 545 U.S. 231, _, 162 L. Ed. 2d 196, 221, 125 S. Ct. 2317, 2332 (2005) ("Comparing his strike with the treatment of panel members who expressed similar views supports a conclusion that race was significant in determining who was challenged and who was not").

In light of the fact a person's demeanor may easily be used as a pretext for discrimination (Wiley, 165 Ill. 2d at 274-75), defendants' attorneys should have asked Stewart, along with the other jurors, questions about the meaning of his head nodding in order to make a record that could be reviewed by this court. In addition to failing to make a record by questioning Stewart about his head nodding, the record does not establish that Stewart exhibited a specific bias related to this case. See Andrews, 155 Ill. 2d at 293. Plaintiffs' counsel's question and the court's question to the venire about whether they could award a million dollars in damages was not an inquiry that asked the venire to make an assessment of the plaintiffs' case. The damage questions, by the plaintiffs' counsel and the court, were an attempt to determine whether the jurors would have any trepidation about making a million dollar damage award, not whether they would find in plaintiffs' favor. Conversely, although there was a tragedy in this case, the defendants' attorneys' questions and the court's questions were designed to determine if the jurors would be reluctant to enter a judgment for the defendants if the plaintiffs failed to prove their case. All the jurors answered these questions by nodding or shaking their heads. As a result, we do not believe that Stewart or the white venirepersons who nodded their heads exhibited any type of bias related to this case, because the same jurors nodded or shook their heads in response to questions by the defendants' attorneys and the court.

In conclusion, given the fact that the record establishes that black and white jurors nodded their heads when asked questions by the court, plaintiffs and defendants' counsel, we believe that the defendants' reasons

for excluding Stewart were pretextual, and hold that the trial court's finding -- that the defendants were primarily concerned about the black jurors' attitudes about damages -- was clearly erroneous. We also hold that the trial court's finding that the defendants offered a valid race-neutral reason for excluding venireperson Stewart was clearly erroneous because the record establishes that Stewart engaged in the same conduct as white jurors who were not challenged or excused from the jury. Finally, I hold that venireperson Stewart was denied equal protection of the laws because he was treated differently from white jurors because the record does not establish that Stewart exhibited a specific bias toward damages that was not exhibited by white jurors who nodded their heads but were permitted to serve on the jury.

### B. Orlassia Sims

When considering venirewoman Orlassia Sims, the defendants' attorneys stated that they used their peremptory challenge to exclude her from the jury because, like Stewart, she nodded her head when plaintiffs' counsel asked about awarding damages and in defense counsel's opinion she appeared to be disinterested in the proceedings. The record establishes that black and white jurors nodded their heads when asked questions about damages. We find, in this case, that head nodding, standing alone, was not a valid race-neutral reason for excluding Sims, a black juror, from this jury.

Now, we turn to the defendants' perception that Sims was disinterested in the proceedings. Defense counsel stated that he was concerned that Sims would not be motivated to pay attention during the case. Like head nodding, disinterestedness is a form of conduct or demeanor that may be considered a legitimate race-neutral reason for the exercise of a peremptory challenge. People v. Gray, 326 Ill. App. 3d 906, 912 (2001), citing People v. Johnson, 218 Ill. App. 3d 967, 986 (1991). However, like head nodding, disinterestedness is a subjective assessment that the court is required to give close scrutiny to because such perceptions may easily be used as a pretext for discrimination. See Williams, 209 Ill. 2d at 245; Wiley, 165 Ill. 2d at 274-75.

The defendants cite People v. Gray, 326 Ill. App. 3d 906 (2001), to support their position that

disinterest is a valid race-neutral reason for excluding a person from the jury. We find the facts in Gray distinguishable from the facts in this case. At the Batson hearing in Gray, the prosecutor explained that he used a peremptory challenge to exclude an African-American venirewoman because during the jury selection process she was checking her watch as she was being questioned and she was looking around the courtroom. Gray, 326 Ill. App. 3d at 912. The prosecutor also stated that the venirewoman indicated that she lived at a senior citizen home. Gray, 326 Ill. App. 3d at 912. The prosecutor stated that the home was not a normal nursing home and he was concerned that the venirewoman may have some type of disability. Gray, 326 Ill. App. 3d at 912. The Gray court found that it was irrelevant whether the venirewoman's lack of interest was due to a disability because the prosecutor's explanation of her inattentiveness was a valid race-neutral reason for excluding her. Gray, 326 Ill. App. 3d at 912.

In this case, unlike Gray, the defendants' attorney did not make a record by providing a clear and reasonably specific explanation of what he perceived to be Sims' disinterested behavior. In Gray, the prosecutor explained on the record that the venirewoman kept looking at her watch while being questioned and that she kept looking around the room. In this case, however, the defendants' attorney made no attempt on the record to explain the specific conduct that he believed demonstrated that Sims was disinterested in the proceedings. Here, defense counsel simply stated that she seemed disinterested. Again, we note that conduct and demeanor must be given close scrutiny because such perceptions may easily be used as a pretext for discrimination. See Williams, 209 Ill. 2d at 245; Wiley, 165 Ill. 2d at 274-75. In this case, defendants' attorney failed to make a record which provided a clear and reasonably specific description of Sims' behavior that he believed demonstrated Sims' lack of interest in the case. Batson, 476 U.S. at 98 n.20, 90 L. Ed. 2d at 88 n.20, 106 S. Ct. at 1724 n.20. We find that the record fails to support the defendants' attorney's race-neutral reasons for excusing Sims as a juror in the case. Accordingly, I hold that Sims was also denied equal protection of the laws because, like Stewart, Sims was treated differently from white jurors who nodded their heads when answering questions about damages but were permitted to serve on the jury by the defendants, and the record

failed to reveal any evidence of being disinterested in the case.

### C. Norma Collins

Next, we review the defendants' proffered race-neutral reason for using a peremptory challenge to exclude venirewoman Norma Collins. Defendants' attorney stated that he excluded Collins because, like Stewart and Sims, she nodded her head when plaintiffs' counsel asked the panel about damages. Defendants' attorney also stated that Collins was excluded because she indicated that she was involved in a worker's compensation case for an injury she sustained on her job and defense counsel perceived that Collins thought the lawsuit was a positive thing. Defense counsel stated that he perceived Collins to be a litigious person. The record establishes that when asked whether she had ever been a party to a lawsuit, Collins stated that she was a party to a worker's compensation case. The trial judge then stated, "One thing everybody should understand is that the worker's compensation system is totally different than this. It has different rules, different regulations, different structure, totally different." The trial judge said to Collins "So can you just forget about that," and Collins responded "yes."

In our review of the record -- with Collins merely stating that she was a party to one worker's compensation lawsuit -- there were no statements in the record by Collins that indicated that Collins took pride in being a party in her worker's compensation lawsuit. Dr. Keddington's attorney's conclusion that Collins considered being a party to a lawsuit a positive thing is a subjective assessment of Collins based upon her conduct or demeanor. As previously discussed with regard to venirepersons Stewart and Sims, conduct and demeanor must be given close scrutiny because such perceptions may easily be used as a pretext for discrimination. Wiley, 165 Ill. 2d at 274-75. Here, we note that Dr. Keddington's counsel did not ask Collins any additional questions about his perceptions of her statements and he did not provide a clear and reasonably specific explanation of her conduct that he perceived to indicate that she thought being party to a lawsuit was something to be proud of. Even if Collins thought it was positive to be a party to a worker's compensation lawsuit, defense counsel failed to articulate how that established that Collins had a specific bias against the

defendants in the present case.  See Andrews, 155 Ill. 2d at 293.  "Litigious" means prone to engage in lawsuits. See Black's Law Dictionary 841 (5th ed. 1979).  We do not believe that Sims' involvement in one lawsuit makes her a litigious person.  We believe that defense counsel's argument that Collins is a litigious person is pretextual because she had only been involved in one law suit and there is nothing in the record to support counsel's statement that Collins considered her participation in that lawsuit to be a positive thing.  Moreover, as was the case with Stewart and Sims, we find that Collins' head nodding was not a valid race-neutral reason for excluding her from the jury and by doing so she was also denied equal protection of the laws.  Accordingly, we find that the defendants' attorneys  failed to provide a race-neutral reason for excluding Collins from the jury or established that Collins exhibited a bias toward the defendants in this case.

In summary, in this case, I hold that the defendants proffered race-neutral reasons for excluding Stewart, Sims and Collins, the three black venirepersons, were pretextual. More importantly, we note that when reviewing a proffered race-neutral explanation for excluding a venireperson, " 'we [may not] close our eyes as judges to what we must perceive as men' ".  Randall, 283 Ill. App. 3d at 1026, quoting Knapp, 230 N.Y. at 63. Because the defendants' proffered race-neutral reasons are pretextual, they denied Stewart, Sims and Collins equal protection of the laws by purposefully excluding the three black jurors from the jury.  Purkett, 514 U.S. at 768, 131 L. Ed. 2d at 839, 115 S. Ct. at 1771.  Furthermore, defendants' attorneys' explanations do not establish that Stewart, Sims and Collins, the excluded venirepersons, exhibited a specific bias in this case. Andrews, 155 Ill. 2d at 293.  The defendants maintain that they did not engage in purposeful discrimination because they did not exercise peremptory challenges against the three black jurors that served on the jury. The defendants' argument lacks merit because the exclusion of even one minority venireperson because of race is unconstitutional and requires reversal of the case.  See Andrews, 155 Ill. 2d at 294, citing People v. Harris, 129 Ill. 2d 123, 175 (1989). In trials involving litigants from different ethnic or racial groups, there is a compelling governmental or state interest in having a diverse jury, otherwise, the litigants are denied equal protection of the

laws. <u>Grutter v. Bollinger</u>, 539 U.S. 306, 323-25, 156 L. Ed. 2d 304, 329-30, 123 S. Ct. 2325, 2336-37 (2003).[3] Accordingly, we reverse and remand this case for a new trial, but I reverse because the trial court's finding that the plaintiffs did not prove that the defendants engaged in purposeful discrimination against the black jurors, Larry Stewart, Orlassia Sims, and Norma Collins, was clearly erroneous and denied the black jurors and litigants equal protection of the laws.

### III. IPI Civil (2005) No. 12.05

While we have already reversed this case, we address this issue because it may come up again on retrial in the trial court. The plaintiffs argue that the trial court erred in providing the jury with IPI Civil (2005) No. 12.05 because there was no credible evidence presented at trial which would allow for an argument that a pneumothorax was the sole proximate cause of Ms. Warren's death. The plaintiffs maintain that the cause of Ms. Warren's death was peritonitis resulting from the defendants' negligence. IPI Civil (2005) No. 12.05 provides as follows:

"If you decide that a [the] defendant[s] was [were] negligent and that

his [their] negligence was a proximate cause of injury to the plaintiff, it is not a

defense that something else may also have been a cause of the injury.

[However, if you decide that the sole proximate cause of injury to the

plaintiff was something other than the conduct of the defendant, then your

verdict should be for the defendant.]" IPI Civil (2005) No. 12.05.

The plaintiffs argue that the instruction was improper because the evidence presented at trial established that Ms. Warren suffered from pneumothorax that occurred after she suffered a cardiac arrest. The plaintiffs argue

_____

[3] " 'The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color. If both are not accorded the same protection [given an opportunity to serve on the jury], then it is not equal.' " <u>Grutter</u>, 539 U.S. at 323, 156 L. Ed. 2d at 329, 123 S. Ct. at 2336, quoting <u>Regents of the University of California v. Bakke</u>, 438 U.S. 265, 289-90, 57 L. Ed. 2d 750, 770-71, 98 S. Ct. 2733, 2747-48 (1978).

that the evidence demonstrated that Ms. Warren died as a result of peritonitis which caused her cardiac arrest.

The defendants argue that the plaintiffs' argument misapprehends the law. The defendants cite to Nassar v. County of Cook, 333 Ill. App. 3d 289, 297 (2002), to support their position that as long as the jury was provided with some competent evidence that someone or something other than the defendants' conduct caused the injury at issue, then the sole proximate cause instruction was proper and the trial court's refusal to give it would constitute reversible error. The defendants argue that there was competent evidence presented at trial to warrant a sole proximate cause instruction. The defendants note that Dr. Anderson, Dr. Keddington, and defense expert Dr. Fitzgibbons testified that the cause of Ms. Warren's death was not peritonitis but pneumothorax and the resulting cardiopulmonary arrest. As a result, the defendants maintain that IPI Civil (2005) No. 12.05 was properly given to the jury.

In a jury trial, each party has the right to have the jury clearly and fairly instructed upon each theory which was supported by the evidence. Nassar v. County of Cook, 333 Ill. App. 3d 289, 297 (2002), citing Leonardi v. Loyola University of Chicago, 168 Ill. 2d 83, 100 (1995). The sole proximate cause instruction requires that there be some evidence to justify giving the instruction. McDonnell, 192 Ill. 2d at 515; see also Nassar, 333 Ill. App. 3d at 297. It is within the circuit court's discretion to determine what issues are raised by the evidence and whether an instruction should be given. Nassar, 333 Ill. App. 3d at 297, citing In re Nancy M., 317 Ill. App. 3d 167 (2000). The test for determining the propriety of tendered instructions is whether the jury was fairly, fully, and comprehensively informed as to the relevant principles considering the instructions in their entirety. Leonardi, 168 Ill. 2d at 100. The notes on use indicate that the long form of IPI Civil (2005) No. 12.05 is only appropriate "where there is evidence tending to show that the sole proximate cause of the occurrence was something other than the conduct of the defendant." IPI Civil (2005) No. 12.05, Notes On Use. "A defendant has the right not only to rebut the evidence tending to show that defendant's acts are negligent and the proximate cause of claimed injuries, but also has the right to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's

injuries. Further, if the evidence is sufficient, the defendant is entitled to an instruction on this theory." Leonardi, 168 Ill. 2d at 101.

We must review the record to determine whether there was any evidence presented at trial which tends to show that the sole proximate cause of Ms. Warren's death was something other than the conduct of the defendant. See IPI Civil 12.05, Notes On Use, at 12-11. Dr. Judith Keddington, a board-certified surgeon, testified that she examined Ms. Warren on May 8 and found her condition to be stable. She noted an increase in Ms. Warren's white blood cell count and ordered an infectious disease consultation. Dr. Keddington also ordered intravenous nutrition, an increase in fluid administration and antibiotics. Dr. Keddington testified that blood gases drawn at this time showed very low oxygen levels and poor blood circulation. Ms. Warren ultimately went into cardiopulmonary arrest. Dr. Keddington testified that a portable chest Xray showed that Ms. Warren had suffered a "tension pneumothorax," which occurs when air leaks out of the lungs and accumulates in the chest around the heart and cardiac arteries. It pushes the heart to one side and collapses the veins, preventing blood from returning to the heart and preventing the heart from pumping blood to other organs.

Dr. Shaku Teas, a forensic pathologist and the plaintiffs' expert witness, testified that the cause of death for Ms. Warren was peritionitis due to perforation of the stomach. On cross-examination, Dr. Teas testified that he could not say whether Ms. Warren would have sustained cardiopulmonary arrest if she had not had a tension pneumothorax. Additionally, the record reveals that defense expert witness Dr. Robert Fitzgibbons, a board- certified general surgeon and professor of surgery at Creighton University, testified that Ms. Warren did not die of peritonitis, as plaintiffs claimed, but as a result of the tension pneumothorax that occurred on May 9 and led to cardiopulmonary arrest and brain death.

Our review of the testimony presented at trial indicates that four witnesses testified that there was a causative factor other than peritonitis that may have been the proximate cause of Ms. Warren's death. Specifically, defense witnesses Dr. Fitzgibbons, Dr. Anderson, and Dr. Keddington testified that the cause of

Ms. Warren's death was not peritonitis but pneumothorax and the resulting cardiopulmonary arrest. In our review of the record, the defendants presented sufficient competent evidence to justify the trial court giving the instruction. Accordingly, the trial court did not abuse its discretion when IPI Civil (2005) No. 12.05 was given to the jury.

### IV. Judgment Notwithstanding the Verdict

In light of our decision to remand this case for a new trial because of the Batson violation, we need not reach plaintiffs' final argument that the trial court erred in failing to grant a judgment notwithstanding the verdict. R.W. Dunteman Co. v. C/G Enterprises, Inc., 181 Ill. 2d 153, 168 (1998) (it is not necessary to reach the merits of the defendants' other arguments in light of remand); see also Pietruszynski v. McClier Corp., Architects & Engineers, Inc., 338 Ill. App. 3d 58, 68 (2003).

### V. Conclusion

For the foregoing reasons, the judgment of the circuit court is reversed and this matter is remanded to the circuit court for a new trial.

Reversed and remanded.

QUINN, P.J., specially concurs.

MURPHY, J., dissents.

PRESIDING JUSTICE QUINN, specially concurring:

I agree with Justice Neville that we must reverse this matter and remand it for new trial based on the holding in Batson v. Kentucky, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), and its progeny. I base this decision on a ground different from that found by Justice Neville. I believe that the trial court applied a faulty factual analysis when considering plaintiff's Batson challenges.

"[A] trial court's *third-stage* finding on the ultimate issue of discrimination rests largely on credibility determinations." (Emphasis in original.) People v. Rivera, 221 Ill. 2d at 502, citing

27

McDonnell v. McPartlin, 192 Ill. 2d at 527. Where the record indicates that the trial judge appropriately scrutinized counsel's explanation, the trial judge's determination as to counsel's credibility is entitled to great deference. McDonnell v. McPartlin, 192 Ill. 2d at 529.

In People v. Martinez, 317 Ill. App. 3d 1040, 1044 (2000), this court distinguished the different considerations the trial court must take into account during the second and third steps of the Batson process: "At the second step, the court focuses on the facial validity [of the reason proffered for striking the juror]. At the third step, the court must evaluate the persuasiveness and genuineness of the reason. At this third step, the court cannot just accept the proffered reason without evaluating it against the circumstances of the case."

The Martinez court held that it could not determine whether the State's expressed reason for peremptorily excusing a black juror was pretextual. This was because the trial court held that the issue at the third step of the Batson process was " 'the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral *** In this case, the court finds that the State gave race-neutral reasons [sic] for purposes of excluding Miss Lee ***. Court finds no error in the manner of jury selection.' The trial court's comments demonstrate that it only completed the second-step evaluation pursuant to Batson. Although the trial court stated it was conducting the third-step analysis, it is clear that the court did not in fact conduct the third step." (Emphasis omitted.) People v. Martinez, 317 Ill. App. 3d at 1045.

The statements of the trial court in the instant case similarly reflect that it had only completed the second-step evaluation pursuant to Batson.

In rejecting plaintiff's attorney's assertion that defendants' counsel's use of peremptory challenges was violative of Batson, the court said: "[I]n terms of Mr. Stewart, Ms. Collins, and Ms. Sims, the concerns seem to be their attitudes toward damages, which I believe is a race neutral reason,

so on that basis I'm willing to hold there was no <u>Batson</u> violation here."

After plaintiffs' counsel argued that defendants' counsel's stated reasons that they based their peremptory strikes on the juror's demeanors had no basis in fact, the trial court said:

"THE COURT: Well, we've also [sic] seen jurors. We have all noticed

body language with people. Sometimes that body language is favorable to us

and sometimes it's not.

I'm not going to question the veracity here of the attorneys.

I'm simply saying that as far as I'm concerned there are race neutral reasons

for why these people were excused, and, therefore, I'm not going to sustain

the <u>Batson</u> challenge."

It is well settled that a prospective juror's courtroom demeanor may constitute a legitimate race-neutral reason for excluding that individual. <u>People v. Andrews</u>, 155 Ill. 2d 286, 303 (1993); <u>People v. Young</u>, 128 Ill. 2d 1, 20 (1989). However, because such a subjective explanation for exercising a peremptory strike lends itself to pretext, such an explanation must be closely scrutinized. <u>McDonnell v. McPartlin</u>, 192 Ill. 2d at 528.

In the instant case, the record demonstrates that the trial court did not "closely scrutinize" defendants' counsel's proffered explanations, but rather, the trial court merely accepted their explanations because they were not based on race.

When faced with a similar error occurring during the third step of the <u>Batson</u> process, this court has reversed and remanded cases for the trial court to conduct a proper <u>Batson</u> analysis. See <u>People v. Martinez</u>, 317 Ill. App. 3d at 1046; <u>People v. Davis</u>, 345 Ill. App. 3d at 911-12. Those cases involved allegations that one peremptory challenge was exercised inappropriately. As pointed out by Justice Neville, while the defense peremptorily excused five veniremen, only three of these peremptories are

29

really problematic. Further, while Justice Neville finds that excusing venireperson Norma Collins was pretextual, I do not. I believe that defense counsel were well within their rights to excuse Ms. Collins based on her having previously filed a worker's compensation claim. Defense counsel proffered that they excused venirepersons Orlassia Sims and Larry Stewart due to their having raised their hands when asked whether they could return a verdict in excess of $1 million should the jury find defendant doctors liable for decedent's death. Justice Neville points out that a fair reading of the record reveals that all the potential veniremen raised their hands in response to this question. Consequently, the offered reason for excusing Sims and Stewart - that they indicated support for a large damages award in the case - would not distinguish those two jurors from the rest of the venire who were selected. I agree with Justice Neville on this point, but I do not believe that the record is sufficiently clear to find that the reasons stated by defense counsel were pretextual. However, I do believe that the trial court's statement that "I'm not going to question the veracity here of the attorneys" effectively cut off discussion of the bases for the peremptory strikes. Considering the fact that the trial court judge has since retired, I agree that remandment would be inappropriate. McDonnell v. McPartlin, 192 Ill. 2d at 528. Consequently, I agree that we must reverse this matter and remand it for a new trial.

I believe that the trial court's error in this case is understandable considering the contradictory language utilized by the Supreme Court in applying Batson. As explained by our own supreme court in People v. Harris, 206 Ill. 2d 1, 17 (2002):

"Once a *prima facie* case is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for excusing the venirepersons in question. Hernandez v. New York, 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866 (1991); People v. Williams, 164 Ill. 2d 1, 19 (1994). At this stage of the process, *the explanation given by the prosecutor need not be persuasive, or even plausible.*

Purkett v. Elem, 514 U.S. 765, 768, 131 L. Ed. 2d 834, 839, 115 S. Ct. 1769, 1771

(1995). A neutral explanation is one based on a reason other than race. Harris II,

164 Ill. 2d at 333. ' Unless a discriminatory intent is inherent in the prosecutor's

explanation, the reason offered will be deemed race neutral.' Hernandez, 500 U.S.

at 359, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866." (Emphasis added.)

See also People v. Munson, 206 Ill. 2d 104, 117 (2002); People v. Crockett, 314 Ill. App. 3d 389 (2000), using the same language.

Webster's Third New International Dictionary 1736 (1986) defines "plausible" as "superficially worthy of belief: credible; being such as may be accepted as real (*eg*. a plausible pretext)." It is clearly contradictory to say that a prosecutor's explanation need not be "plausible" but that courts must "closely scrutinize" these same explanations.

The contradictory nature of this language is highlighted by the language used recently by the Supreme Court in Miller-El v. Dretke, 545 U.S. 231, 252, 162 L. Ed. 2d 196, 125 S. Ct. 2317, 2331-32 (2005);

"As for law, the rule in Batson provides an opportunity to the prosecutor

to give the reason for striking the juror, and it requires the judge to assess the

plausibility of that reason in light of all evidence with a bearing on it. 476 U.S.,

at 96-97; Miller-El v. Cockrell, 537 U. S., at 339. It is true that peremptories

are often the subjects of instinct, Batson v. Kentucky, 476 U.S., at 106 (Marshall,

J., concurring), and it can sometimes be hard to say what the reason is. But when

illegitimate grounds like race are in issue, *a prosecutor simply has got to state his*

*reasons as best he can and stand or fall on the plausibility of the reason he gives*.

A Batson challenge does not call for a mere exercise in thinking up any rational basis.

>If the stated reason does not hold up, its pretextual significance does not fade because
>
>a trial judge, or an appeals court, can imagine a reason that might not have been shown
>
>up as false." (Emphasis added.)

It is not at all surprising that trial courts and attorneys occasionally have great difficulty in addressing <u>Batson</u> challenges considering that the guidance given by courts of review is not only unclear, it is contradictory.

JUSTICE MURPHY, dissenting:

I respectfully dissent. Whether or not defendants intended to discriminate on the basis of race in exercising peremptory challenges, is a question of fact. Because there is seldom much evidence on this issue, the trial court's determination rests largely on the demeanor and credibility of the attorney exercising the challenge, the tenor of the *voir dire,* and the behavior of the prospective jurors. Therefore, we must determine, by examining the record, whether the trial court's determination on a <u>Batson</u> challenge was clearly erroneous. <u>Hernandez v. New York</u>, 500 U.S. 352, 365, 114 L. Ed. 2d 395, 409, 111 S. Ct. 1859, 1869 (1991). Under this standard of review, we grant the trial court deference and only overturn its determination if left with a "definite and firm conviction that a mistake has been committed." <u>United States v. United States Gypsum Co.</u>, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948). Where two "plausible" views of the evidence have been presented, the trial court's choice of one cannot be clearly erroneous and a court of review may not reverse even if convinced it would have weighed the evidence differently. <u>Anderson v. City of Bessemer City</u>, 470 U.S. 564, 573-74, 84 L. Ed. 2d 518, 528, 105 S. Ct. 1504, 1511 (1985).

Our supreme court has affirmed the holding that the exclusion of a minority venireperson based on a certain characteristic while accepting a white venireperson who shares the same characteristic

does not, in and of itself, invalidate a party's explanation as pretextual. People v. Williams, 209 Ill. 2d 227, 245 (2004). The Williams court continued to highlight that peremptory challenges are based on a combination of traits. The possession of one additional nondiscriminatory negative trait over another allows for proper use of a peremptory challenge. Williams, 209 Ill. 2d at 245-46, citing People v. Wiley, 165 Ill. 2d 259, 282-83 (1995). Demeanor alone as a race-neutral reason may be sufficient, but must be closely scrutinized. Williams, 209 Ill. 2d at 247.

Therefore, the trial judge must weigh the demeanor, context and atmosphere of the participants and the courtroom to best determine the credibility of the proffered reason. The inherent difficulty in an appellate analysis of this issue is that the record does not, and cannot, provide a full report of nonverbal cues. Although we carefully scrutinize the reasoning of the party, second-guessing a determination that is so reliant on subjective and nonverbal expressions must not be done lightly. See Miller-El v. Dretke, 545 U.S. 231, 267-73, 162 L. Ed. 2d 196, 230-35, 125 S. Ct. 2317, 2340-45 (2005) (Breyer, J., concurring); Rice v. Collins, 546 U.S.__, 126 S. Ct. 969, 976-77, 163 L. Ed. 2d 824, 834-35 (2006) (Breyer, J., concurring).

The obvious social and constitutional import of this subject, the difficulty of the subject, and the deference and trust we must place in the trial court to properly determine a just result are in serious tension. Determining and articulating the motivation and reason for an instinctive decision to exercise a peremptory challenge may be impossible for the attorney utilizing the challenge, much less a reviewing court. Subconscious factors that may rest upon impermissible racial, religious, ethnic or gender-based stereotypes may be unknowingly at play. The result is a very challenging analysis utilizing competing standards of review to determine something that may be impossible to truly accomplish in person, much less via a cold record.

In any event, in this case, I first agree with Justice Quinn that defendants' challenge of venireperson Norma Collins was not pretextual. Defendants challenged Collins on the basis of her having filed a worker's compensation claim and their belief that her demeanor exhibited a favorable attitude toward litigation damages. This combination of traits set Collins apart from the venire and was sufficient to withstand the Batson challenge. The trial court's denial of this challenge was not clearly erroneous.

With respect to Orlassia Sims and Larry Stewart, the record indicates generally that jurors nodded, laughed and raised their hands in response to certain questions. Justice Neville highlights that the consequence of all potential jurors answering in the same fashion did not distinguish Sims and Stewart from their white counterparts. I do not disagree with his finding that a fair reading of the record indicates that all members of the group responded in the same fashion.

However, the challenges of Sims and Stewart specifically highlighted the body language and way in which each answered the questions. Defendants were wary of Stewart's body language, which they felt indicated a strong support for large damage claims. As for Sims, defendants believed that she acted disinterested and would not be a good, active juror.

I agree with Justice Quinn that the trial court's statement "I'm not going to question the veracity here of the attorneys," is a concern. However, I do not believe this may be interpreted to overcome the deference we must pay the trial court on issues so dependent on evaluations of the participants' demeanor and credibility. I believe that the trial court's comment was a slip of the tongue - an oversimplification of its finding that defendants' stated reasons were plausible and credible. Although many race-neutral answers may be stock answers that attorneys use over and over, thereby making the Batson process a "charade," they nonetheless have been accepted as proper race-neutral reasons. See

People v. Randall, 283 Ill. App. 3d 1019, 1025-26 (1996). The trial court found the reasons to be properly race-neutral and most importantly that defendants' belief in them was credible.

The facts of this case have not left me with a definite and firm conviction that a mistake was made by the trial court. The cold record cannot overcome the credibility determination made by the trial court. We have no way of knowing the manner in which the participants nodded their heads or raised their hands. From the record, we do not know if they were slouching or looking around bored or excitedly supporting the idea of large damages.

We do know that defendants felt that both Stewart's and Sims' demeanor and body language indicated a mindset they did not find favorable to their clients. We do know that defendants also felt that Sims' body language and demeanor indicated a general disinterest in the proceedings. The trial court was able to observe the attorneys and the venire. The trial court concluded that the defendants' race-neutral explanations were credible. These explanations are plausible. Therefore, I would find the trial court's denial of plaintiff's Batson challenge was not clearly erroneous.

Until such time as the court picks the jury or until there are no juries in civil cases, there will likely be conflict in resolving questions of prejudice in jury selection. I do not know if Justice Breyer's assertions that peremptory challenges are unworkable merit abandoning the current system - that is another question for another place – but, while the present system remains, I agree with Justice Gallagher's conclusion in Randall, 283 Ill. App. 3d at 1030-31 (Gallagher, J., concurring in part & dissenting in part): the trial court should not face the unenviable burden of second-guessing an attorney's use of peremptory challenges when a facially valid reason for exclusion has been exercised in a credible fashion.