Third Division 

January 7, 2004 

No. 1-01-1966

THE PEOPLE OF THE STATE ) Appeal from the

OF ILLINOIS, ) Circuit Court of

) Cook County 

Plaintiff-Appellee, ) 

)

v. ) No. 99 CR 3720 

) JACKIE DAVIS,       ) Honorable 

) Edwards M. Fiala, Jr.

Defendant-Appellant.   ) Judge Presiding.

JUSTICE HALL delivered the opinion of the court:

On February 2, 2001, following a jury trial, defendant, Jackie Davis, also know as "Little Jack," was convicted of second-degree murder.  On April 6, 2001, after denying defendant's motion for a new trial, the circuit court sentenced defendant to 18 years' imprisonment in the Illinois Department of Corrections.  After defendant's motion to reconsider sentence was denied, he filed his timely notice of appeal on April 10, 2001.

On appeal, defendant contends that: (1) the State unconstitutionally exercised a peremptory challenge to exclude the only African-American venireperson in violation of the principles set forth in 
Batson v. Kentucky
, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986); (2) the circuit court erred by admitting Amos Ward's handwritten statement as substantive evidence pursuant to section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 1998)); (3) he was denied a fair trial because the prosecutor made numerous improper and prejudicial remarks during closing argument; and (4) the trial court abused its discretion in sentencing him to 18 years' imprisonment.  For the reasons that follow, we remand with directions.

FACTUAL BACKGROUND

Defendant's conviction arose from the fatal shooting of Vincent Ruffin.  Evidence was presented that a little after midnight on August 12, 1998, Ruffin, Arki Clark, and Thomas Lake were standing together in a vacant lot near 5th Avenue and Whipple Street in Chicago, Illinois, when they were approached by defendant and a second individual, nicknamed "Tone Bone."  Ruffin was a member of the New Breed street gang, Clark was a member of the Four Corner Hustlers, and Lake was a member of the Gangster Disciples.  Evidence was presented that defendant was a member of the Gangster Disciples.  Defendant, who was dressed in black pants and a black hooded sweatshirt, approached the group from an alley gangway.  Tone Bone was also dressed in black clothing.

Defendant walked up to Ruffin and the two engaged in an increasingly heated argument regarding money and/or the sale of drugs in the vacant lot.  After about five minutes of arguing, Ruffin asked defendant whether he was "strapped," meaning did defendant have a gun.  Defendant responded that he was not "strapped" and then raised his arms and patted himself down to show Ruffin that he did not have a gun on his person.  After approximately another four or five minutes of arguing, defendant pulled a small revolver from his waistband and shot Ruffin twice.

Doctor Mitra Kalelkar, a Cook County assistant chief medical examiner, testified that she performed an autopsy on Ruffin's body.  The doctor testified that Ruffin sustained a through-and-through gunshot wound to his neck and a second gunshot wound to the abdomen.  The doctor testified that Ruffin's cause of death was multiple gunshot wounds and his manner of death was homicide.

Lake testified that after the shooting, he ran about two blocks to a hotel where he called the police and reported the incident.  Afterwards Lake got into his car with Clark to look for defendant.  At about 2 a.m., on August 13, 1998, Lake and Clark were stopped by the police for driving erratically.  The police found a gun in Lake's car.  Lake and Clark were taken to the police station, where they both gave statements regarding the shooting and identified defendant from a photograph as the shooter.

Amos Ward, defendant's cousin, testified at trial that at approximately 9:15 p.m., on August 11, 1998, he was sitting on his front porch when defendant rode up on a bicycle.  Defendant wanted to borrow some clothes.  Ward testified that he could not remember the type or color of clothing he lent defendant.  Defendant departed Ward's house with the borrowed clothing, leaving his bicycle behind.  Sometime after midnight, defendant returned to Ward's house, retrieved his bicycle and left.  Ward also testified that after the shooting incident he gave a written statement to the police and gave testimony before the grand jury.

Ward's written statement and a transcript of his grand jury testimony were both published to the jury.  Ward's written statement and grand jury testimony were substantially different from his trial testimony.

According to Ward's grand jury testimony, on August 11, 1998, at about 9:15 p.m., he was sitting on his front porch when defendant rode up on a bicycle.  Defendant wanted to borrow some clothing, which was unusual.  Defendant borrowed two pairs of dark blue jeans and then left on his bike.  Ward testified that the next time he saw defendant was early the next morning on August 12, 1998, at about 12:30 a.m.  A white, four-door Chevy with tinted windows dropped defendant off in front of Ward's house.  Defendant told Ward that he wanted to speak with him in private.  Ward and defendant then went to the basement of Ward's house, where defendant made a telephone call to his girlfriend Trina.  Defendant asked Trina to go to Sacramento Boulevard and 5th Avenue to see if the police or an ambulance were in the area.  Ward stated that after defendant hung up the telephone, he and defendant went outside and walked around the corner.  Defendant wanted to tell his fellow gang members about the shooting so they could be on the look-out for any retaliation from rival gang members from the New Breed gang.  Ward stated that defendant was a member of the Gangster Disciples street gang.  According to Ward, defendant stated that on the night of the shooting he had gotten into an argument with Ruffin, who was a member of the New Breed street gang, about selling drugs in New Breed territory.  Defendant stated that during the course of the argument when he informed Ruffin that neither he nor his partner had guns, Ruffin began acting tougher and threatened to retrieve a gun saying, "after I go down the street when I come back I'm going to come back shooting."  Defendant stated that he then pulled out a .38-caliber handgun and fired twice.  Defendant said that he knew he hit Ruffin at least one time.  Defendant ran from the scene after shooting Ruffin and afterwards gave his gun to an individual named "Greg."  According to Ward, after defendant told him about the shooting incident, defendant made a second telephone call and shortly thereafter Trina arrived at the house in a red Altima and picked up defendant.

Assistant State's Attorney Adam Monreal testified that he interviewed defendant and took his handwritten, five-page statement.  The statement was published to the jury.  According to defendant's statement, on August 12, 1998, at around midnight he approached Ruffin who was standing with two other men in the area of 5th Avenue near Sacramento Boulevard.  Defendant stated that he confronted Ruffin because he wanted to know why Ruffin had disrespected him and his godmother.  Defendant stated that as he and Ruffin argued, Ruffin told him to "get the f--k out of here before [I] kill [your] bit-h a-s."  Ruffin then asked defendant if he had a gun, and defendant responded that he was not carrying a gun.  Defendant and Ruffin continued to argue whereupon Ruffin went to his car and told defendant that he "would kill his bit-h a-s."  When Ruffin returned from his car, defendant and Ruffin continued arguing, face-to-face.  Ruffin's two associates were standing near Ruffin.  When Ruffin put his hands down by his waist, defendant pulled a handgun from his waistband and shot Ruffin twice.  After shooting Ruffin, defendant ran from the scene, threw his handgun in an alley, and went to his godmother's house located around the corner in order to warn her about Ruffin's friends.  Defendant then left his godmother's house and went over to his cousin Amos Ward's house.  After leaving Ward's house defendant went to his grandmother's house.  Defendant stated that after the shooting, he laid low for five months.

The parties then stipulated that the partially deformed bullet recovered from Ruffin's body was a "380, 357 caliber bullet exhibiting six lans and grooves with a left hand twist."  The State rested after the exhibits were admitted into evidence.

After the circuit court denied defense counsel's motion for a directed verdict, the defense rested without presenting any evidence.

At the close of the evidence and after closing arguments, the jury deliberated for two days and thereafter returned a verdict finding defendant guilty of second-degree murder. Defendant was subsequently sentenced to 18 years' imprisonment in the Illinois Department of Corrections.  Defendant now brings this direct appeal.

ANALYSIS

I. 
Batson
 Claim

Defendant, who is African-American, first contends that the trial court erred in finding that he failed to establish a 
prima facie
 case of purposeful discrimination under 
Batson v. Kentucky
, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), after the court allowed the prosecutor to exercise a peremptory challenge to remove the only African-American from the venire.  Defendant maintains that the trial court's determination that he failed to establish a 
prima facie
 case of a 
Batson
 violation was against the manifest weight of the evidence.  We agree.

In 
Batson
, the United States Supreme Court held that, in a criminal case, the fourteenth amendment's equal protection clause prohibits a prosecutor from using a peremptory challenge to exclude a prospective juror solely on the basis of his or her race. 
Batson
, 476 U.S. at 89, 90 L. Ed. 2d at 83, 106 S. Ct. at 1719.  Under 
Batson
, the equal protection clause is violated when the facts show that the State excluded an African-American venireperson on the assumption that he or she will be biased in favor of defendant simply because of their shared race. 
Batson
, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

The 
Batson
 Court provided a three-step process for evaluating claims of discrimination in jury selection.  First, the defendant must meet his burden of making a 
prima facie
 showing that the State exercised its peremptory challenge on the basis of race. 
People v. Easley
, 192 Ill. 2d 307, 323, 736 N.E.2d 975 (2000).  If a 
prima facie
 case is made, the burden then shifts to the State to articulate a race-neutral explanation for excusing the venireperson. 
Easley
, 192 Ill. 2d at 323-24.  Once the State articulates its reasons for excusing the venireperson in question, the process moves to the third step, where the trial court must determine whether the defendant has carried his burden of establishing purposeful discrimination.  At the third step, the trial court considers the reasons provided by the State as well as claims by the defendant that the proffered reasons are pretextual. 
People v. Pecor
, 286 Ill. App. 3d 71, 74, 675 N.E.2d 141 (1996).

Under 
Batson
, in order to establish a 
prima facie
 case of racial discrimination in jury selection, a defendant was required to first show that he was a member of a cognizable racial group and that the prosecutor had exercised peremptory challenges to exclude venirepersons of defendant's race.  Second, defendant was entitled to rely on the fact that peremptory challenges can be used to facilitate discrimination in jury selection.  And finally, defendant was required to show that these facts and any other relevant circumstances raised an inference that the prosecutor used peremptory challenges to exclude certain venirepersons on account of their race. 
Batson
, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723; 
People v. Edwards
, 144 Ill. 2d 108, 151-52, 579 N.E.2d 336 (1991).

Batson
's first element was effectively eliminated by the holding in 
Powers v. Ohio
, 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991), wherein the Court held that a criminal defendant may bring a 
Batson
 claim whether or not defendant and the excused venireperson share the same race. 
People v.
 
Andrews
, 146 Ill. 2d 413, 425, 588 N.E.2d 1126 (1992).  Still, the racial identity between a defendant and an excluded venireperson remains a relevant factor in determining whether a 
prima facie
 case of discrimination has been established. 
People v. Harris
, 206 Ill. 2d 1, 28, 794 N.E.2d 314 (2002).

After 
Powers
, in order for a defendant to establish a 
prima facie
 case of purposeful discrimination by the prosecution in the exercise of its peremptory challenges, defendant must present relevant factors or circumstances which raise an inference that the prosecutor challenged venirepersons on account of their race.  Some of the factors generally deemed relevant in establishing a 
prima facie
 case of discrimination include: (1) the racial identity between the defendant and the excluded venireperson; (2) a pattern of strikes against African-American venirepersons; (3) a disproportionate use of peremptory challenges against African-American venirepersons; (4) the level of African-American representation in the venire as compared to the jury; (5) the prosecutor's questions and statements during 
voir dire
 examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogenous group sharing race as their only common characteristic; and (7) the race of the defendant, victim and witnesses. 
People v. Williams
, 173 Ill. 2d 48, 71, 670 N.E.2d 638 (1996).  These examples of the generally recognized relevant factors or circumstances are "merely illustrative," and are not all inclusive. 
Batson
, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723; 
People v. Holman
, 132 Ill. 2d 128, 173, 547 N.E.2d 124 (1989).

In the present case, defendant argues that the shared racial identity between himself and Mr. Summers, and the fact that the prosecutor used a peremptory challenge to remove Summers, who was the only African-American on the venire, were relevant factors or circumstances sufficient to raise an inference that the prosecutor peremptorily challenged Summers on account of his race.  We agree.  Our review of the evidence in light of the relevant factors defendant presents reveal that defendant established a 
prima facie
 case of purposeful discrimination under 
Batson
 and that the trial court's ruling to the contrary was against the manifest weight of the evidence.

The 
voir dire
 examination revealed that Summers had no previous record, no prior jury service, nor was any member of his family ever charged or convicted of a crime.  Summers had been employed as a maintenance engineer for 13 years.  He was single with two children and had lived at his current address for approximately five years.  His adult child attended Harold Washington College and beautician school.  Summers stated that he had never served as a juror, did not know any of the parties or witnesses involved in the case, did not know the lawyers, and had never heard or read anything about the case.

Summers stated that he did not have any family or friends who were associated with law enforcement.  Neither Summers nor any member of his family had been a complainant or witness in a criminal case.  Summers stated that he had been a victim of auto theft, and had a friend who about 10 years ago testified as a witness in a rape case.  Summers asserted that neither of these experiences would prevent him from being fair and impartial.  He also maintained that evidence of gang activity and guns would not prevent him from being fair and impartial.  Summers stated that he would follow the law, he would base his verdict on the evidence, and would have no problem rendering either a guilty or not guilty verdict.

Nothing in the 
voir dire
 examination of Summers reveals any basis for excluding him from the jury panel.  A review of the record reveals that Summers had substantially the same characteristics as the other accepted members of the venire, except for his race.  This court has previously determined that the selection of Caucasian jurors and the exclusion of even a single African-American juror sharing common characteristics raises an inference that the African-American juror was excluded solely on the basis of race. 
People v. Holmes
, 272 Ill. App. 3d 1047, 1057, 651 N.E.2d 608 (1995).  This state of the record raises an inference that the prosecutor used his peremptory challenge to exclude Summers on account of his race.  Absent some reasonable ground, apparent on the record, for exercising a peremptory challenge, the record raises an inference that the challenge was exercised for a racially discriminatory purpose.  As a result, defendant has established a 
prima facie
 case of discrimination under 
Batson
. See 
People v. Parker
, 166 Ill. App. 3d 123, 127, 519 N.E.2d 703 (1988) (finding that defendant established a 
prima facie
 case of purposeful discrimination under 
Batson
 where the prosecution used a peremptory challenge to exclude the only African-American in the venire); 
Commonwealth v. Harris
, 409 Mass. 461, 465-67, 567 N.E.2d 899, 903-04 (1991) (and cases cited therein); 
Stanley v. State
, 313 Md. 50, 84-87, 542 A.2d 1267, 1283-85 (1988) (and cases cited therein).

The State contends that defendant failed to establish a 
prime facie
 case of racial discrimination under 
Batson
 because the record does not affirmatively show that Summers was the only possible African-American venireperson.  We must reject the State's contention.  At the time Summers underwent his 
voir dire
 examination, 8 of 12 jurors had already been empaneled and 3 venirepersons who were ultimately empaneled had already been questioned.  Thus, it was reasonably probable that at the time Summers was questioned only one more juror was required.

At the 
Batson
 hearing, defense counsel argued that Summers was the only possible African-American venireperson that could sit on the jury stating, "Judge, [Summers] answered every question put to him by the Court in exactly the same fashion as every other juror.  He's the only male black that could possibly sit on this jury, apparently the only black that could sit because of the way the judge questions the jurors, having them slide down.  We believe this is being done, he's being excused because he's black."  The prosecutors never disputed, objected to or corrected defense counsel's statement that Summers was the only possible African-American that could sit on the jury.  And the trial court never corrected defense counsel's statement in this regard.  In fact, the trial court informed defense counsel, "[y]ou made your record."  Under these circumstances, a record was created in accordance with defense counsel's statement that Summers was the only African-American that could sit on the jury. See 
People v. Partee
, 268 Ill. App. 3d 857, 865-66, 645 N.E.2d 414 (1994) (holding that defense counsel's undisputed, on-the-record statements about the race of an excluded venireperson may be considered when determining whether defendant properly preserved the record for review of 
Batson
 claim); 
Andrews
, 146 Ill. 2d at 429-30 (holding that defense counsel's on-the-record statement as to the number of strikes used to exclude African-American venirepersons represented evidence establishing the number of strikes, where the State failed to offer any evidence objecting to or correcting the statement).

The State also maintains that the mere coincidence that Summers and the unchallenged Caucasian jurors shared certain characteristics does not establish purposeful discrimination because Summers may have possessed an additional trait that caused the prosecutor to excuse him.  In other words, the State asserts in essence that there could have been race-neutral reasons which accounted for the exclusion.  Any such proffered reasons, however, are irrelevant at this first stage of the 
Batson
 analysis, because at this stage, the issue is not whether there were any legitimate race-neutral reasons for the exclusion but, rather, whether defendant established a 
prima facie
 case of purposeful discrimination under 
Batson
. 
Holmes
, 272 Ill. App. 3d at 1058.

The State next contends that the dismissal of one African-American venireperson does not constitute a pattern of strikes against African-American venirepersons.  Under 
Batson
, a pattern of discrimination in the State's use of peremptory challenges is one of the relevant factors or circumstances a trial court may consider in determining whether a defendant has established a 
prima facie
 case of purposeful discrimination. See 
People v. Edwards
, 301 Ill. App. 3d 966, 971-72, 704 N.E.2d 982 (1998) (noting that one relevant circumstance is whether there was a pattern of strikes against African-American venire members). However, in cases where there was only one African-American in a venire and that venireperson had been peremptorily challenged by the State, this court along with reviewing courts in other jurisdictions have held that a "pattern of strikes" was not the exclusive basis on which a defendant could establish a 
prime facie
 case of purposeful discrimination under 
Batson
. See 
Parker
, 166 Ill. App. 3d at 127; 
Harris
, 409 Mass. at 465-67, 567 N.E.2d at 903-04.

In cases such as this one, where there is only one African-American in the venire, it would be virtually impossible for a defendant to provide evidence of a pattern of discriminatory strikes in the State's use of peremptory challenges. See 
Edwards
, 301 Ill. App. 3d at 990 (Rathje, J., specially concurring in part and dissenting in part).  If the absence of a "pattern of strikes" were enough, in and of itself, to defeat the establishment of a 
prima facie
 case of discrimination under 
Batson
, this would effectively enable a prosecutor to exercise at least one peremptory challenge in a discriminatory manner.  Such a possibility is untenable in light of the fact that pursuant to 
Batson
 and its progeny, the exclusion of just one venireperson on account of race is unconstitutional 
and requires reversal of the conviction. See 
People v. McDonald
, 125 Ill. 2d 182, 200-01, 530 N.E.2d 1351 (1988); 
People v. Harris
, 129 Ill. 2d 123, 175, 544 N.E.2d 357 (1989).  Therefore, in the context of this venire, in which there was only one African-American venireperson, a "pattern of strikes" was an irrelevant factor in determining whether defendant established a 
prima facie
 case of discrimination under 
Batson
.

We also find that the trial court erred by improperly collapsing stages one and three of the 
Batson
 analysis.  As previously mentioned, 
Batson
 establishes a three-step analysis to determine whether the State used its peremptory challenges to remove venirepersons on the basis of race.  First, the defendant must establish a 
prima facie
 case of purposeful racial discrimination in jury selection by showing that the State exercised its peremptory challenges to remove members of a cognizable racial group from the venire. 
Easley
, 192 Ill. 2d at 323.  Second, if a 
prima facie
 case is made, the burden then shifts to the State to articulate a race-neutral explanation for excusing the venireperson. 
Easley
, 192 Ill. 2d at 323-24.  Once the State articulates its reasons for excusing the venireperson in question, the process moves to the third step, where the trial court determines whether the defendant has carried his burden of establishing purposeful discrimination.  At the third step, the trial court considers the reasons provided by the State as well as claims by the defendant that the proffered reasons are pretextual. 
Pecor
, 286 Ill. App. 3d at 74.

In the present case, the trial court improperly collapsed the first and third stages of the 
Batson
 analysis by determining that no 
prima facie
 case was established based in part upon a finding that the prosecutors were credible.  The trial court erred in this regard because it is only at step three, after the State has satisfied its step-two burden of production and articulated its race-neutral reasons for excusing the venireperson in question, that the court is allowed to evaluate the prosecutor's credibility. See 
People v. Crockett
, 314 Ill. App. 3d 389, 397-98, 731 N.E.2d 823 (2000) ("[t]o allow the court to rely on its own reasons without eliciting any explanations by the State would effectively omit step two of the 
Batson
 process and collapse it into step three.  Moreover, the elimination of step two would effectively merge step one and step three into a single step since both require evaluations by the court of evidence produced by the defense, contrary to the three-step 
Batson
 process structured by the United States Supreme Court [citations]").

On remand, the trial court will accept that a 
prima facie
 case of purposeful discrimination has been established and will conduct a 
Batson
 hearing at which the State is to provide race-neutral explanations for peremptorily challenging Summers.  Rubber-stamp approval to offered nonracial explanations should not be given.  The prosecution's explanation need not rise to the level justifying exercise of a challenge for cause, but it may not rebut defendant's 
prima facie
 case by merely denying there was a discriminatory motive. See 
People v. Allen
, 168 Ill. App. 3d 397, 404, 521 N.E.2d 1172 (1987), citing 
Batson
, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.  The prosecutor's explanation must be "'clear and reasonably specific,'" it must contain "'legitimate reasons' for exercising the challenge[]," and it must be "'related to the particular case to be tried.'"
 Allen
, 168 Ill. App. 3d at 404, quoting 
Batson
, 476 U.S. at 98 & n. 20, 90 L. Ed. 2d at 88-89 & n. 20, 106 S. Ct. at 1723 & n. 20.

II. Conclusion

In view of our disposition of this case on the 
Batson
 issue, we do not address defendant's remaining issues at this time.  After the 
Batson
 proceeding on remand has been completed and any supplementary issues briefed, we will announce our judgment on all pending issues.  Accordingly, we remand to the circuit court of Cook County with directions to conduct a 
Batson
 hearing at which the State is to provide race-neutral explanations for the use of its peremptory challenge against Summers.  The circuit court shall make findings of fact and conclusions of law which, together with the record of the proceedings, shall be filed with the clerk of this court within 60 days of the filing of this order.  We retain jurisdiction for the purpose of reviewing the determination of the circuit court, and the defendant and State will be allowed to submit supplemental briefs addressing this issue in this court. See 
People v. Buckley
, 168 Ill. App. 3d 405, 413, 522 N.E.2d 86 (1987); 
People v. Jones
, 177 Ill. App. 3d 663, 669, 532 N.E.2d 543 (1988); 
People v. Garrett
, 139 Ill. 2d 189, 193-96, 564 N.E.2d 784 (1990).

Remanded with directions.

SOUTH and KARNEZIS, JJ., concur.