THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRILYN HOGAN, Defendant-Appellant.

First District (4th Division)   No. 1—06—3039

Opinion filed March 19, 2009.—Rehearing denied April 21, 2009.

Michael J. Pelletier and Caroline E. Bourland, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Marie Q. Czech, and Thomas M. Hardman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE NEVILLE delivered the opinion of the court:

The defendant, Terrilyn Hogan, and her codefendant, Leon Alexander, were charged with endangering the life of Hogan's children. Following a jury trial, the defendant was convicted of three counts of child endangerment and sentenced to two years' probation. In this appeal, the defendant presents the following issues for our review: (1) whether the State proved her guilty beyond a reasonable doubt; (2) whether the State violated *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), when it failed to provide race-neutral reasons for exercising three of its four peremptory challenges or, in the alternative, whether this court should remand for a *Batson* hearing; (3) whether the prosecutor committed misconduct when she (a) bolstered the credibility of the State's witnesses and (b) introduced inadmissible evidence; and (4) whether the trial court erred when it entered the sentencing order because it imposed an unauthorized fee. For the following reasons, we reverse the defendant's conviction and remand for a new trial.

## I. BACKGROUND

### A. Pretrial

The facts are limited to those required to decide this case. On May 11, 2004, the defendant was charged with three counts of endangering the life and health of her children (Y.T., L.N., and C.W.), in violation of section 12—21.6 of the Criminal Code of 1961. 720 ILCS 5/12—21.6 (West 2004).[1] The defendant's and the codefendant's trials were conducted simultaneously with separate juries.

### B. *Voir Dire*

The court gave opening instructions to the jury, questioned the

---

[1] The defendant was initially charged with four counts of endangering the life of a child, but the State nol-prossed one of the charges.

entire venire, and provided the parties with an opportunity to question the venire. Neither party posed any questions. After concluding *voir dire*, the court held a hearing outside the presence of the jury and heard motions for cause.

The State made a motion to excuse Eva Knickerson for cause. The State argued that Knickerson expressed difficulty recalling things, that she was on medication, and that she had trouble with comprehension and hearing. Defense counsel noted that she understood every question asked of her, seemed fine, and could sit closer to the witness stand if selected as a juror. The court found that an appropriate inquiry had been made, that Knickerson indicated that she could be fair and impartial, and that she could follow the testimony. Therefore, the court found that Knickerson was not subject to the State's challenge for cause.

The State also made motions to excuse Victoria Johnson and Pietro Lega for cause, and the court granted the motions. The defendant made a motion to excuse Rama Patel for cause, and the motion was granted by the court.

## 1. *Panel I*

The court tendered the jury questionnaires for the first four venirepersons to the State: Cory Hips, Erica Nava, Gloria Houssein, and Margaret Janecki. The State exercised peremptory challenges on Hips and Houssein. The court replaced Hips and Houssein with Case Bergraft and Diane Puller. The State accepted the four venirepersons and tendered them to the defendant. The defendant exercised a peremptory challenge on Janecki, and the court replaced Janecki with Bernice Getz. The defendant exercised a peremptory challenge on Getz, and the court replaced Getz with Richard Fengal. The defendant exercised a peremptory challenge on Fengal, and the court replaced Fengal with Kelly Jansen. The defendant and the State accepted the following four venirepersons: Bergraft, Nava, Puller, and Jansen.

## 2. *Panel II*

The court tendered the jury questionnaires for the next four venirepersons to the defendant: Daniel Gillespie, Diane Zureba, Sodari Lin, and Eva Knickerson. The defendant tendered the four venirepersons to the State. After the State exercised a peremptory challenge on Knickerson and the court replaced Knickerson with Annie Otono, the following colloquy took place:

"[DEFENSE COUNSEL]: That's the second African American. Defense would ask to state a reason for Ms. Knickerson.

THE COURT: Before we get to that, I would have to find the prim fails [*sic*] as there is already an African American on this jury.

And I would state that this is the second time we have picked a jury. I don't find as a matter of law any invidious discrimination that's going on.

Certainly you can renew your motion at another time. But I think—and I can take into consideration the way the State has stricken in the jury that was picked earlier as well as the potential veniremen and the way they are picked now.

And I don't find that at this time they need to provide racial neutral reasons. As they do not, I don't find, have exercised—I think the first prong of *Batson* is for me to find that they are exercising or engaging in invidious discrimination. I don't so find.

But your objection is noted for the record. But I would like the record to further reflect that there is already an African American on this panel and a number on the other panel. And I don't find that these State's Attorneys are engaging in racial reasons to exploit.

[THE PROSECUTOR]: Judge, we will add to that, we further made an objection for cause on Ms. Knickerson before we stated numerous reasons as to why we thought she should be stricken, none of which had to do with race."

The parties then accepted the following panel: Gillespie, Zureba, Lin, and Otono.

### 3. *Panel III*

The court tendered the jury questionnaires for the next four venirepersons to the State: Thomas Pratt, Ernest Piolini, Magdalana Oriaza, and Kathleen Mirabella. The State exercised a peremptory challenge on Magdalana Oriaza. The court replaced Oriaza with Michele McArthur. The State accepted the panel and tendered it to the defendant. The defendant exercised a peremptory challenge on McArthur. The court replaced McArthur with Sheila Hanley. The defendant exercised her final peremptory challenge on Hanley. The court replaced Hanley with Charlie Jackson. The defendant accepted the panel and tendered it to the State. The State exercised its final peremptory challenge on Jackson. The following colloquy took place:

"[DEFENSE COUNSEL]: I would like to renew the *Batson* objection, your Honor.

THE COURT: Would you please spread your reasons of record.

[DEFENSE COUNSEL]: That's three out of four African Americans that have been challenged out of the State. Just because one African American makes it onto the panel doesn't mean there has been some sort of discrimination in the rejecting of the other African Americans.

I don't—again, I am trying to find what is the race neutral reason for Mr. Jackson; maybe Ms. Knickerson, yes, there was an argu-

ment for cause. But as far as Mr. Jackson goes, we have had other people who have been allowed on this panel who were victims of robbery.

We have other people who have lived on the south side. We have other people who have retired. I don't know what it is about Mr. Jakcson [sic] other than his skin color that would make him challenge at this point.

THE COURT: Although I do not find that the State is engaging in systematic exclusion of jurors based on race, at this time I am going to ask that they do provide and make a record as to the way they have been striking.

[THE PROSECUTOR]: Judge, specifically as to Charlie Jackson, in addition to the fact that he had been shot and was a victim of a robbery and his wife was the victim of a strong arm robbery which are all felony crimes, those facts make us think that he might be less likely to take serious the allegations in this misdemeanor case based on the experiences he has had with felony cases.

In addition, Judge, he did not testify that he had any children of any sort. I believe that would not—he may not be able to be sympathetic to the allegations in this case that do involve three young children.

Furthermore, he indicated that he had a spouse. It was unclear whether that spouse was deceased or divorced; which due to the fact that there is specifically with Ms. Hogan, some circumstances of at least in the State's opinion, whether or not she left and got out of the situation that was abusive to possibly herself and her children.

Those are also factors that we believe may have a bearing on the juror's decision in the case.

[THE COURT]: For the record, is there anything else you might want to state further as to how you have exercised your previous challenges, not only as it related to the African American venire, but the venire in general?

[THE PROSECUTOR]: Judge, of our preemptories [sic], the last preemptory [sic] we struck was not an African American individual.

THE COURT: Would that be Ms. Knickerson?

[THE PROSECUTOR]: No. Ms. Oriaza.

THE COURT: And as to Ms. Knickerson, you spread of record race neutral issues?

[THE PROSECUTOR]: Yes. That is correct, your Honor.

And Cory Hips, we struck who was an 18 year old. And he was a white male. That was our first preemptory [sic] that we used. Certainly not based—he was not an African American.

And as to Gloria Houssein who was our second preemptory [sic], she was an African American. It was her employment as a certified

nursing assistant that made us concerned about things, injuries, things she may have seen on children; as holding that position that may have made her think that the allegations in this case were ot [*sic*] as serious as her experience and her employment.

THE COURT: Anything further as to the defense motion?

A. No.

[DEFENSE COUNSEL]: Yes. As far as—again, getting back to Mr. Jackson, the fact that he stated that he was a victim—I don't believe I understand the State's point.

There was no indication that he said that he was—that the people had been found or not found. He just said he was a victim.

Why the fact that he was a victim would somehow be prejudicial to the State—It's almost counter intuitive.

THE COURT: But it is race neutral, correct?

[DEFENSE COUNSEL]: Well, although unlike other instances where people who have been allowed on the venire who are the victim of a robbery, victim of a burglary, who are white have not been challenged.

THE COURT: Anything further?

[DEFENSE COUNSEL]: No, your Honor.

THE COURT: Okay. I just want the record to reflect that as to the initial inquiry, I do not find that the State engaged in systematic exclusion of jurors based on race.

And I say that based on the pattern of first of all, the cause challenges that they asked for; and also the pattern in which they have exercised their preemptories [*sic*].

I can also take into consideration those two State's Attorney's [*sic*] who have picked an earlier panel with me. And there was nothing of that sort that arose to *Batson*.

So I make that a part of the record. And I also find that the State has sufficiently made race neutral reasons. So I will not engage in the remedy of sitting Mr. Jackson. And I will allow the State to exercise their final preemptory [*sic*]."

The court replaced Jackson with Tracy Corso. The parties accepted the final panel: Pratt, Piolini, Corso, and Mirabella. The court called Nancy Freeman as the first alternate juror, whom the parties accepted. The court then called Elisa Alvarez as the second alternate juror, whom the parties accepted.

## C. The Trial

L.N., the defendant's 10-year old son, testified that he received various forms of punishment. "Voltage" occurred when L.N. had to take his pants off and lie on the bed, and the defendant would hit him 50 to 100 times as the codefendant counted. L.N. further testified that the codefendant would punish L.N. by making him stand in a closet

up to 24 hours. L.N. also testified that he would be punished by having to stand by the dining room table while everyone else ate food.

Y.T., the defendant's 16-year-old daughter, testified that the codefendant would use different forms of punishment. "Voltage" occurred when the codefendant lashed her hands 50 to 100 times with a leather belt. "24" occurred when she could not sleep and had to stand in the closet for hours. Once she had to stand in a closet in a room for a three-day period, and the defendant was asleep in the room. "Fasting" occurred when she could not have food, for up to seven consecutive days, while the defendant ate food at the table.

C.W., the defendant's 18-year-old son, testified that "voltage" occurred when the codefendant hit his hands 25 to 100 times with a leather belt. "24" occurred when he had to stand in the closet from the evening until the morning. "Fasting" occurred when he could not have food, for up to five days, while the defendant ate food at the table.

Detective Nicholas Cikulin testified that the defendant told him that she observed the codefendant physically discipline L.N., Y.T., and C.W., and observed the codefendant hit the children's hands with a belt 15 to 30 times and hit L.N. on the buttocks 20 to 30 times. The defendant also told the detective that the children were forced to stand in a corner or in a closet for 12 or more hours, and that they were forced to fast for several days. Finally, the defendant told the detective that she believed the codefendant's discipline was wrong and she felt bad, but there was nothing she could do because she had nowhere to go and no one to turn to.

## D. The Verdict

At the conclusion of the trial, the jury found the defendant guilty of endangering the life and health of her children (Y.T., L.N., and C.W.). On July 21, 2006, the court sentenced the defendant to two years' supervision. On September 7, 2006, the defendant filed an amended motion for judgment notwithstanding the verdict and in the alternative a new trial. The court denied the motion.

## II. ANALYSIS

### A. The Defendant's *Batson* Challenges

The defendant contends that she was denied equal protection because the State failed to provide genuine, race-neutral reasons for exercising three out of its five peremptory challenges against black venirepersons. The defendant also contends that the State's reasons for exercising its peremptory challenges on Jackson, Houssein, and Knickerson were pretextual. Alternatively, the defendant argues that this

court should remand for a *Batson* hearing because the trial court improperly collapsed the three-step *Batson* process and overruled her objection to the State's peremptory challenges before reaching the third stage of the *Batson* analysis.

The State responds that the trial court properly followed the three-stage *Batson* inquiry and that the trial court correctly found that the defendant had not met her burden of establishing a *prima facie* case. The State also argues that it provided race-neutral reasons for the peremptory challenges.

## B. The *Batson* Record

As an initial matter, we note that the State argued in its brief on appeal that the defendant waived her right to challenge the State's use of its peremptory challenges because the defendant made no record of the racial makeup of the entire venire. During oral arguments, however, the State conceded that the record was sufficient for the appellate court to review the defendant's *Batson* issue. Therefore, we need not address the State's argument that the record is insufficient to review this issue.

Nevertheless, we note that in a recent Illinois Supreme Court case the court found that its review of the defendant's *Batson* issue was hampered by the inadequacy of the record from the *Batson* hearing that was held below. *People v. Davis*, 231 Ill. 2d 349, 364 (2008). Specifically, the *Davis* court noted: (1) that the defendant attempted to compare the excluded black venirepersons to jurors that were accepted whose races were unknown; (2) that the record did not reveal the total number of black venirepersons compared to the total number who served on the jury; and (3) that the record did not reveal the total number of black venirepersons who were struck by the use of peremptory challenges exercised by the State. *Davis*, 231 Ill. 2d at 364. The *Davis* problems would be solved if the jurors' questionnaires were made a part of the record: the moving party should (1) make a motion and ask the trial judge to supply counsel with a copy of the jurors' questionnaires so counsel can write relevant information (the race, religion or any other pertinent information) on each juror's questionnaire that is material to the *Batson* objection but was omitted from the jurors' questionnaires; and (2) make a motion to have the jurors' questionnaires (705 ILCS 305/10.2 (West 2006)) file stamped and made a part of the record. We find, however, that the record in the instant case contains the information that was missing in *Davis*. In the instant case, the record reveals, and the State acknowledges on appeal, that the State exercised its five peremptory challenges in the following manner: (1) three peremptory challenges were exercised against black

venirepersons (Houssein, Knickerson, and Jackson); (2) one peremptory challenge was exercised against an Asian venireperson (Oriaza); and (3) one peremptory challenge was exercised against a white venireperson (Hips). In addition, the State acknowledges in its brief that 5 of the 27 venirepersons were black, and that 2, 1 juror and 1 alternate, of the 14 jurors were black: Nancy Freeman was the alternate. Therefore, we find that the record in the instant case provides this court with the information it needs to address the defendant's *Batson* issue. *Davis*, 231 Ill. 2d at 364.

## C. The Three-Step *Batson* Procedure

■ In *Batson*, the United States Supreme Court held that the equal protection clause of the fourteenth amendment prohibits a prosecutor from using its peremptory challenges to exclude a prospective juror solely on the basis of his or her race. *Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 82-83, 106 S. Ct. at 1719. The *Batson* court provided a three-step procedure for evaluating claims of discrimination in jury selection. *Mack v. Anderson*, 371 Ill. App. 3d 36, 44 (2006), citing *Rice v. Collins*, 546 U.S. 333, 338, 163 L. Ed. 2d 824, 831, 126 S. Ct. 969, 973 (2006).

First, the moving party must make a *prima facie* showing that the nonmoving party exercised its peremptory challenge on the basis of race. *Mack*, 371 Ill. App. 3d at 44, citing *Rice*, 546 U.S. at 338, 163 L. Ed. 2d at 831, 126 S. Ct. at 973, citing *Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723; *People v. Easley*, 192 Ill. 2d 307, 323 (2000). " '[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' " *Davis*, 231 Ill. 2d at 360, quoting *Johnson v. California*, 545 U.S. 162, 170, 162 L. Ed. 2d 129, 139, 125 S. Ct. 2410, 2417 (2005). In determining whether the prosecutor's decision to remove a potential juror is motivated by racial bias, the court must consider " 'the totality of the relevant facts' and 'all relevant circumstances.' " *Davis*, 231 Ill. 2d at 360, quoting *Batson*, 476 U.S. at 93-94, 96-97, 90 L. Ed. 2d at 85-86, 88, 106 S. Ct. at 1721, 1723. In assessing the existence of a *prima facie* case, one factor that the court can use is " 'comparative juror analysis,' " in which the court examines " 'a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group.' " *Davis*, 231 Ill. 2d at 361, citing *Boyd v. Newland*, 467 F.3d 1139, 1145 (9th Cir. 2006). In addition to the comparative analysis, the following factors assist the court in evaluating whether a *prima facie* case exists:

"(1) the racial identity between the party exercising the peremptory challenge and the excluded venirepersons; (2) a pattern of strikes against African-Americans on the venire; (3) a disproportionate use of peremptory challenges against African-Americans; (4) the level of African-American representation in the venire compared to the jury; (5) the prosecutor's questions and statements of the challenging party during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim and witnesses." *Davis*, 231 Ill. 2d at 362, citing *People v. Rivera*, 221 Ill. 2d 481, 501 (2006).

Second, if the moving party makes a *prima facie* showing, the burden then shifts to the nonmoving party to articulate a race-neutral explanation for excusing the venireperson. *Mack*, 371 Ill. App. 3d at 44, citing *Rice*, 546 U.S. at 338, 163 L. Ed. 2d at 831, 126 S. Ct. at 973, citing *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723; see also *Easley*, 192 Ill. 2d at 323-24. Once the nonmoving party articulates race-neutral reasons for excusing the venireperson in question, the trial court must then determine whether the moving party has carried his burden of establishing purposeful discrimination. *Mack*, 371 Ill. App. 3d at 44, citing *Rice*, 546 U.S. at 338, 163 L. Ed. 2d at 831, 126 S. Ct. at 973, citing *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1724.

At the third step, the trial court is supposed to evaluate the reasons provided by the nonmoving party as well as the moving party's claim that the proffered reasons are pretextual. *Mack*, 371 Ill. App. 3d at 44, citing *Rice*, 546 U.S. at 338, 163 L. Ed. 2d at 831, 126 S. Ct. at 973; *People v. Davis*, 345 Ill. App. 3d 901, 906 (2004), citing *People v. Pecor*, 286 Ill. App. 3d 71, 74 (1996). Finally, "[t]he trial court's finding of whether purposeful discrimination has been proved is a finding of fact and will not be overturned on review unless it is found to be clearly erroneous." *Mack*, 371 Ill. App. 3d at 46, citing *Hernandez v. New York*, 500 U.S. 352, 365, 114 L. Ed. 2d 395, 409, 111 S. Ct. 1859, 1869 (1991); *People v. Andrews*, 155 Ill. 2d 286, 293-94 (1993).

### 1. *The First Batson Objection*

In the instant case, the record reveals that the defendant made two *Batson* objections and the trial court ruled on the defendant's objections. The defendant made her first *Batson* objection after the State exercised its peremptory challenge on Knickerson and the defendant asked the State "to state a reason for Ms. Knickerson." In response, the trial court stated "[b]efore we get to that, I would have to find the prim fails [*sic*] as there is already an African American on

this jury." The trial court then took into consideration (1) the fact that another jury had already been selected; (2) the manner in which the State struck venirepersons during the codefendant's jury selection; (3) the manner in which the State struck venirepersons during the defendant's jury selection; and (4) the fact that the State did not challenge a black juror in the first panel. The trial court found that the State had not engaged in invidious discrimination, and therefore, the State did not need to provide race-neutral reasons for exercising a peremptory challenge against Knickerson.

We must first decide whether the defendant's objection to the exclusion of Knickerson and the court's ruling constitute a hearing. The term "hearing" is "generally understood as meaning a judicial examination of the issues between the parties, whether of law or of fact." *Anthony v. Gilbrath*, 396 Ill. 125, 128 (1947), citing *Glennon v. Britton*, 155 Ill. 232, 243 (1895).

After reviewing the defendant's objection and the court's ruling, we find that the trial court judicially examined the State's use of its peremptory challenges because the trial court ruled on the *Batson* objection. *Gilbrath*, 396 Ill. at 128, citing *Glennon*, 155 Ill. at 243. The next question becomes, did the trial court follow the three-step procedure required for a *Batson* hearing? *Mack*, 371 Ill. App. 3d at 44, citing *Rice*, 546 U.S. at 338, 163 L. Ed. 2d at 831, 126 S. Ct. at 973, citing *Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723. The first step in *Batson* requires the moving party to make a *prima facie* showing that the nonmoving party exercised its peremptory challenge on the basis of race. *Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723. In the instant case, the record reveals that at no time during the first objection did the trial court ask the defendant to make a *prima facie* showing that the State exercised its peremptory challenge against Knickerson on the basis of race. Rather, after the defendant noted that the State exercised a second peremptory challenge against Knickerson and asked the State to state the reasons why it exercised its peremptory challenge against Knickerson, the trial court found that the State had not engaged in invidious discrimination. Without asking the defendant to make a showing and comply with the first step of the three-step *Batson* procedure, the trial court made a judicial determination that the State was not engaged in discrimination before the defendant was afforded an opportunity to make her *prima facie* case. *Davis*, 231 Ill. 2d at 360, quoting *Johnson*, 545 U.S. at 170, 162 L. Ed. 2d at 139, 125 S. Ct. at 2417. Because the trial court failed to ask the defendant, before making its ruling, to make a *prima facie* showing as mandated by *Batson* that the State was engaged in purposeful discrimination when exercis-

ing its peremptory challenges, we find that the trial court did not follow the three-step procedure delineated in *Batson. Rice*, 546 U.S. at 338, 163 L. Ed. 2d at 831, 126 S. Ct. at 973, citing *Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723.

## 2. *The Second Batson Objection*

The defendant also raised the *Batson* issue a second time after the State exercised its final peremptory challenge on Jackson. The defendant objected and noted: (1) that the State exercised three out of its five[2] peremptory challenges on black venirepersons; (2) that the fact that the jury included one black juror did not mean that there was no discrimination when other prospective black jurors were excluded from the jury; and (3) that there were jurors that were members of the jury who, like Jackson, were robbery victims, lived on the south side, and were retired. Therefore, the defendant argued that there was no explanation for the State's decision to exercise a peremptory challenge on Jackson other than the color of Jackson's skin. Immediately following the defendant's objection, the court found that the State had not engaged in a "systematic exclusion" of jurors based on race. Then the court asked the State to make a record and explain why it exercised its peremptory challenges. After the State provided its reasons for exercising its peremptory challenges, the court (1) found that the State was not engaged in the "systematic exclusion of jurors based on race"; (2) noted the manner in which the State exercised its challenges for cause; (3) noted the State's pattern of exercising its peremptory challenges; (4) considered the fact that the two assistant State's Attorneys had selected another jury for the codefendant; and (5) found that the State provided race-neutral reasons for excluding black venirepersons.

The colloquy between the judge and the parties' attorneys reveals that the trial court judicially examined the State's use of its peremptory challenges, but did not follow the three-step *Batson* procedure. As noted above, the first step in *Batson* requires the moving party to make a *prima facie* showing that the nonmoving party exercised its peremptory challenge on the basis of race. *Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723. Here, the trial court requested and afforded the defendant an opportunity to make a *prima facie* showing that the State exercised its peremptory challenge on Jackson on the basis of race, and the defendant set forth her reasons for her

---

[2]During the trial and in the defendant's initial brief, the defendant argued that the State exercised three of its four peremptory challenges on black venirepersons. However, the record reveals that the State exercised three of its five peremptory challenges against black venirepersons.

*Batson* objection. Therefore, we find that the trial court completed the first step in *Batson*.

During the second step in *Batson*, if the moving party makes a *prima facie* showing, the nonmoving party is required to articulate a race-neutral explanation for excusing the juror. *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723. In the instant case, after the defendant made her objection and stated that she believed the State exercised its peremptory challenge on Jackson because of his race, the trial court rendered its decision that the State was not engaged in purposeful discrimination. We find that the trial court (1) permitted the defendant to make a *prima facie* showing that the State exercised its peremptory challenge on the basis of race, (2) rendered its decision that the State was not engaged in "systematic exclusion of jurors based on race," and (3) asked the State to provide race-neutral reasons for exercising its peremptory challenges. Therefore, the court first made its decision and then completed the second step in *Batson* by having the State provide race-neutral reasons for exercising its peremptory challenges.

The third step in *Batson* imposes a duty on the trial court to determine whether the defendant carried his burden of establishing purposeful discrimination. *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1724. In doing so, the court evaluates the reasons provided by the State as well as the defendant's claim that the State's proffered reasons are pretextual. *Mack*, 371 Ill. App. 3d at 44, citing *Rice*, 546 U.S. at 338, 163 L. Ed. 2d at 831, 126 S. Ct. at 973; *Davis*, 345 Ill. App. 3d at 906, citing *Pecor*, 286 Ill. App. 3d at 74. Here, the court did not evaluate the defendant's argument that the State's reasons for exercising its peremptory challenge on Jackson were pre-textual, or her argument that sitting jurors had characteristics and personal experiences similar to Jackson's. Therefore, because the trial court failed to evaluate whether the defendant made a *prima facie* showing that the State exercised its peremptory challenge on the basis of race, made a decision that the State was not engaged in purposeful discrimination before the State provided its reasons for exercising its challenges, and failed to evaluate the defendant's claim that the State's proffered reasons were pretextual, we find that the trial court did not fulfill its duty to engage in analysis of the parties' arguments by explaining, after following the three-step *Batson* procedure, why the defendant's argument failed to establish that the State's reasons for exercising its peremptory challenges were pretextual and why there was no purposeful discrimination when the State exercised 60% of its peremptory challenges against black venirepersons.

### 3. *Pretextual Explanations*

Even if the trial court's hearings met the minimum *Batson* standards, we would still find that the State violated *Batson* when it exercised its peremptory challenge and excluded Jackson, one of the black venirepersons. In *Mack*, this court explained how to evaluate a party's race-neutral explanations:

> "We also note that the explanation for excusing a venireperson need not rise to the level of a challenge for cause; however, a mere assertion of nondiscriminatory motive or of good faith will not rebut a *prima facie* case. *People v. Andrews*, 155 Ill. 2d 286, 293 (1993); see also *Davis*, 345 Ill. App. 3d at 911 (the trial court should not give rubber-stamp approval to offered nonracial explanations). The explanation must be clear and reasonably specific, it must contain legitimate reasons for exercising the challenge, and it must be related to the particular case to be tried. *Batson*, 476 U.S. at 98 & n.20, 90 L. Ed. 2d at 88-89 & n.20, 106 S. Ct. at 1723-24 & n.20; *Davis*, 345 Ill. App. 3d at 911, citing *People v. Allen*, 168 Ill. App. 3d 397, 404 (1987). The explanation must demonstrate that the excluded venireperson exhibited a 'specific bias' related to the particular cause on trial, other than that his or her shared race with a party may bias him or her in favor of that party. *Andrews*, 155 Ill. 2d at 293." *Mack*, 371 Ill. App. 3d at 45-46.

*Davis* holds that the mere number of black venirepersons peremptorily challenged, without more, will not establish a *prima facie* case of discrimination. *Davis*, 231 Ill. 2d at 361. We note that the State had five peremptory challenges and exercised its challenges in the following manner: one peremptory challenge on a white venireperson, one peremptory challenge on an Asian venireperson, and three peremptory challenges on black venirepersons. We note that the State exercised 60% of its peremptory challenges against black venirepersons and 80% of its peremptory challenges on nonwhite venirepersons. The State's exercise of 60% of its peremptory challenges against black venirepersons concerns this court, but *Davis* makes it clear that the mere number of black venirepersons excused is not enough. *Davis*, 231 Ill. 2d at 360-61.

We found additional evidence beyond the number of black venirepersons excused in this case. An inference of purposeful racial discrimination is raised where the State accepts white jurors having the same characteristics as black venirepersons that were excused for having that characteristic. *Andrews*, 155 Ill. 2d at 295, citing *Mack*, 128 Ill. 2d at 239; *People v. McDonald*, 125 Ill. 2d 182, 199 (1988).

The record reveals that there were other jurors who had characteristics and experiences similar to Jackson's. First, there were other jurors who were crime victims or their family members or close

friends were crime victims: (1) juror Nava's friend was shot outside Nava's house; (2) juror Bergraft was a burglary victim: (3) juror Puller was a rape survivor and her son was jumped; (4) juror Gillespie was a burglary victim and his father was held up at gunpoint; and (5) juror Pratt and his mother were home-burglary victims. Second, there were other jurors who either did not have children or the record did not indicate that they had children: (1) juror Nava, (2) juror Jansen, (3) juror Zureba, and (4) juror Otono. Third, there were other jurors who either did not have a spouse or domestic partner or the record did not indicate that they had a spouse or domestic partner: (1) juror Nava, (2) juror Zureba, and (3) juror Otono. Moreover, jurors Pratt and Gillespie indicated that they had spouses at one point, but the record did not reveal whether they had been divorced or widowed. We find that the State's proffered reasons for excusing Jackson were pretextual because the record reveals that a number of jurors the State did not excuse had characteristics and experiences similar to Jackson's.

In addition, we find the trial court's *Batson* analysis suspect because the judge used the outdated "systematic exclusion" test in *Swain* rather than the three-step *Batson* analysis. *Batson*, 476 U.S. at 90-96, 90 L. Ed. 2d at 83-88, 106 S. Ct. at 1719-24.[3] We also find the trial court's reliance on how the State's Attorneys selected jurors and exercised peremptory challenges in the codefendant's trial to be misplaced. The three-step procedure in *Batson* involves an analysis of jury selection in Hogan's case and is only concerned with the equal protection rights of Hogan and Hogan's jurors. Accordingly, *Batson* makes the State's selection of jurors in other cases, even a codefendant's case during a simultaneous jury trial, irrelevant. *Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

"The ' "[c]onstitution forbids striking even a single prospective juror for a discriminatory purpose." ' " *Davis*, 231 Ill. 2d at 360, quoting *Snyder v. Louisiana*, 552 U.S. 472, 478, 170 L. Ed. 2d 175, 181, 128 S. Ct. 1203, 1208 (2008), quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994). Accordingly, we find that Jackson was excluded for a discriminatory purpose and remand this case for a new trial.

---

[3]We note that previously, under *Swain v. Alabama*, 380 U.S. 202, 223, 13 L. Ed. 2d 759, 774, 85 S. Ct. 824, 837 (1965), the issue of equal protection arose only where there was a systematic and purposeful exclusion, in case after case, of black venirepersons from juries because of race. The *Swain* test was subsequently overruled and replaced by the *Batson* three-step procedure. Therefore, we find that the trial court used the outdated "systematic exclusion" test in *Swain* rather than the proper three-step inquiry under *Batson*. *Batson*, 476 U.S. at 90-96, 90 L. Ed. 2d at 83-88, 106 S. Ct. at 1719-24.

## CONCLUSION

In light of the violation of Hogan's constitutional rights during jury selection, it is unnecessary for this court to reach the defendant's other contentions on appeal. Both the federal and state constitutions provide that no person shall be put in jeopardy twice for the same criminal offense. *People v. Pinkonsly*, 207 Ill. 2d 555, 564 (2003), citing U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, §10. "The double jeopardy clause protects a defendant from: (1) a second prosecution after an acquittal; (2) a second prosecution after a conviction; and (3) multiple punishments for the same offense." *People v. Whitfield*, 228 Ill. 2d 502, 516 (2007), citing *People v. Gray*, 214 Ill. 2d 1, 6 (2005). "The prohibition against double jeopardy forbids a second trial if the evidence was insufficient to prove the defendant guilty beyond a reasonable doubt in the initial proceeding." *People v. Davis*, 377 Ill. App. 3d 735, 747 (2007), citing *People v. Taylor*, 76 Ill. 2d 289, 309 (1979). We note that a reversal for trial error is a determination that the defendant has been convicted by means of a fundamentally defective judicial process. *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). A reversal for evidentiary insufficiency occurs when the prosecution has failed to prove its case, and the only proper remedy is a judgment of acquittal. *Olivera*, 164 Ill. 2d at 393. In this case, we find that the evidence was sufficient to convict but the defendant was convicted by a defective jury selection process. Therefore, a new trial is required to correct the errors made by the trial judge during jury selection that deprived Hogan of a fair trial. Accordingly, we reverse the defendant's conviction and remand for a new trial.

Reversed and remanded.

O'BRIEN, P.J., and GALLAGHER, J., concur.